**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 56 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court dated March 29, 2017 at No. |
| | : | 510 EDA 2016 Affirming Judgment of |
| v. | : | Sentence from the Lehigh County |
| | : | Court of Common Pleas, Criminal |
| | : | Division, dated January 11, 2016 at |
| MICHAEL J. HICKS, | : | No. CP-39-CR-0005692-2014. |
| | : | |
| Appellant | : | ARGUED: December 4, 2018 |

**OPINION**

**JUSTICE WECHT**                                        **DECIDED: May 31, 2019**

In a line of Fourth Amendment jurisprudence that began with the landmark decision in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court of the United States has approved of "stop and frisk" practices as a limited departure from the requirement of probable cause and the necessity of warrants for searches and seizures. A cornerstone of modern law enforcement methods, "stop and frisk" is a practical tool designed to encourage the effective investigation and prevention of crime, while maintaining a balance between the constitutionally protected privacy interests of the individual and the needs and safety of law enforcement personnel. Only two conditions must be satisfied to validate the practice—one to justify the "stop," and another to allow a "frisk."

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the

police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

Since 1991, in circumstances where a police officer encounters a person carrying a concealed firearm, our Superior Court has applied the inverse of this bedrock rule. Specifically, in *Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. 1991), the Superior Court held that the "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Id.* at 959 (hereinafter, the "*Robinson* rule").[1] In the instant case, the Superior Court applied the *Robinson* rule to deem lawful the seizure of an individual based solely upon his possession of a concealed handgun, even though he was licensed in Pennsylvania to carry a firearm in such a manner.

We granted allowance of appeal in order to consider the viability of the *Robinson* rule. Because we conclude that the rule contravenes the requirements of the *Terry* doctrine, and thus subverts the fundamental protections of the Fourth Amendment, we overrule *Robinson* and its progeny. The Superior Court's decision in the instant case having descended from *Robinson*'s erroneous proposition of law, and there being no other lawful basis for the seizure at issue, we reverse the order of the Superior Court.

## I.    Background

Although we will revisit the circumstances of this case in greater detail to apply the correct rule of law, *infra* Part III, a brief summary of the facts found by the suppression

---

[1]    *See also Commonwealth v. Mason*, 130 A.3d 148, 153 (Pa. Super. 2015); *Commonwealth v. Hall*, 929 A.2d 1202, 1207-08 (Pa. Super. 2007); *Commonwealth v. Stevenson*, 894 A.2d 759, 772 (Pa. Super. 2006). The Superior Court also has applied the *Robinson* rule in numerous unpublished decisions, including the instant case.

court sets the stage for the lower courts' application of the *Robinson* rule. On June 28, 2014, at approximately 2:30 a.m., a remote camera operator conducting live surveillance of a gas station and convenience store in the City of Allentown notified police officers that a patron of the establishment was in possession of a firearm. According to the suppression court's factual recitation, the "camera operator advised officers that the [observed individual] showed the firearm to another patron, put the firearm in his waistband, covered it with his shirt, and walked inside" the convenience store. Order, 9/18/2015, at 1 n.1.[2]

The observed individual was Michael Hicks. It later emerged that Hicks possessed a valid license to carry a concealed firearm. *See* 18 Pa.C.S. § 6109(a) ("A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle throughout this Commonwealth."). Hicks was not statutorily prohibited from possessing a firearm. Accordingly, on the morning in question, and at the observed location, there was nothing unlawful about Hicks' possession of his handgun, nor the manner in which he carried it.

While responding police officers were en route, Hicks entered and exited the convenience store, then reentered his vehicle. Before Hicks could exit the parking lot, numerous police officers in marked vehicles intercepted and stopped Hicks' vehicle. Believing that Hicks had moved his hands around inside the vehicle, Officer Ryan Alles drew his service weapon as he approached Hicks' vehicle and ordered Hicks to keep his hands up. Officer Kyle Pammer, arriving at the vehicle moments after Officer Alles, restrained Hicks' arms while Officer Alles reached into the vehicle and retrieved Hicks'

---

[2] Although the suppression court found that the police officers received information that Hicks "showed" the firearm to the other patron, the officer who testified at the suppression hearing repeatedly stated that the dispatch advised officers that the suspect was "brandishing" a firearm—a term with a distinct connotation. *See* Notes of Testimony, 7/14/2015, at 6-7, 15. We address this incongruity at greater length below, *infra* Part III.

handgun from a holster on his waistband. Hicks "was removed from the vehicle for safety reasons and handcuffed." Order, 9/18/2015, at 2 n.1. At that point, the officers noticed the odor of an alcoholic beverage emanating from Hicks. The officers then searched Hicks' person and, in his pocket, discovered a bag that contained a small amount of marijuana.

Upon further investigation, the officers determined that Hicks was licensed to carry a concealed firearm. Accordingly, Hicks was not charged with any crime relating to the firearm, nor with any crime relating to the other patron, to whom Hicks "showed" the firearm. Order, 9/18/2015, at 1 n.1. However, having discovered evidence of Hicks' suspected intoxication and possession of marijuana, the police officers arrested Hicks and charged him with driving under the influence of alcohol ("DUI")—high rate of alcohol (second offense), DUI—general impairment (second offense), possession of a small amount of marijuana, and disorderly conduct, graded as a third-degree misdemeanor.[3]

On April 15, 2015, Hicks filed an omnibus pre-trial motion seeking suppression of the evidence and a writ of *habeas corpus*, the latter motion requesting dismissal of the disorderly conduct charge due to the absence of any evidence establishing the elements of that crime. Following a hearing on Hicks' motion on July 14, 2015, the court granted Hicks' motion for a writ of *habeas corpus* and dismissed the charge of disorderly conduct, finding that there "was no evidence presented that [Hicks'] actions were intended to cause substantial harm or serious inconvenience, or that he persisted in disorderly conduct after reasonable warning or request to desist." Order, 9/18/2015, at 2 n.2. However, the court denied Hicks' motion to suppress, reasoning as follows:

> "In limited circumstances, an individual may be stopped, briefly detained, and frisked for investigatory purposes." [*Robinson*, 600 A.2d at 959].

---

[3]    *See* 75 Pa.C.S. § 3802(b); 75 Pa.C.S. § 3802(a)(1); 35 P.S. § 780-113(a)(31); 18 Pa.C.S. § 5503(a)(4), respectively.

> Possession of a concealed weapon in public creates a reasonable suspicion justifying an investigatory stop in order to investigate whether the person is properly licensed. *Id.* (holding recognized by *Commonwealth v. Hall*, 929 A.2d 1202, 1207 (Pa. Super. 2007)). Here, the police had information that [Hicks] was carrying a concealed weapon, and were justified in briefly detaining [Hicks] in order to determine whether [he] was properly licensed. As officers approached [Hicks], he moved his hands towards his waistband. This provided additional information to justify the brief detention of [Hicks] in order to investigate further. Under these circumstances, the stop and detention of [Hicks] was justified, and suppression is not warranted.

*Id.* at 2 n.1. Although the suppression court placed some degree of weight upon the testimony indicating that Hicks had moved his hands inside the car, the court clearly opined that the detention was justified prior to that observation, based solely upon the *Robinson* rule. Simply stated, the suppression court concluded that, under *Robinson*, it was lawful for police officers to seize Hicks immediately upon learning that Hicks possessed a concealed firearm in public.

Hicks proceeded to a non-jury trial. The court found Hicks guilty of one DUI count, and acquitted him of the remaining charges. Hicks was sentenced to a term of incarceration of thirty days to six months and was assessed a monetary fine.

The Superior Court affirmed Hicks' judgment of sentence. *See Commonwealth v. Hicks*, 510 EDA 2016, 2017 WL 1176412 (Pa. Super. Mar. 29, 2017) (unpublished). The court rejected Hicks' argument that the immediate and forcible nature of his seizure amounted to a custodial arrest rather than an investigative detention, concluding instead that the officers had authority to use physical coercion to advance their investigation of the information received through the dispatch. As for the existence of reasonable suspicion justifying that investigative detention, the Superior Court, unlike the suppression court, referred to Officer Pammer's testimony, wherein he asserted that the dispatch advised the officers that Hicks had "brandished" a firearm. *See supra* n.2. However, the Superior Court did not conclude that the purported "brandishing" established reasonable

suspicion that a violent crime might be in progress, or that someone might be in imminent danger.  Rather, like the suppression court, the Superior Court relied exclusively upon the *Robinson* rule, as applied in *Commonwealth v. Mason*, 130 A.3d 148, 151 (Pa. Super. 2015).  The Superior Court held that "[p]ossession of a concealed firearm in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Hicks*, 2017 WL 1176412, at *4 (quoting *Mason*, 130 A.3d at 153).  "Thus," the Superior Court concluded, "the [suppression] court properly ascertained whether officers had a reasonable suspicion that Hicks possessed a concealed firearm in public." *Id.*

Having determined that Hicks' initial detention was lawful because he possessed a concealed firearm, the Superior Court concluded that the remainder of the officers' conduct was justified.  The officers' actions in removing Hicks from his vehicle and handcuffing him, the Superior Court held, were "reasonably necessary to 'freeze the *status quo*,' prevent Hicks from leaving the scene 'in order to ascertain his identity and gather additional information,' and to protect the officers' personal safety." *Id.* (brackets omitted; citing *United States v. Hensley*, 469 U.S. 221, 235 (1985); *In re D.M.*, 727 A.2d 556, 557 (Pa. 1999)).  Only then, during the course of the purportedly lawful encounter, did the officers notice an odor of alcohol.  Accordingly, the Superior Court opined, "the stop was supported by the requisite reasonable suspicion of criminal activity." *Id.*

Hicks sought allowance of appeal in this Court, which we granted in order to consider whether the Superior Court's continued application of the *Robinson* rule comports with the requirements of the Fourth Amendment.[4]  Although our analysis

---

4    Adopting Hicks' phrasing of the question, we granted allowance of appeal to determine:

requires us to consider Pennsylvania's statutory law regarding the possession and carrying of firearms, our polestar is the Fourth Amendment doctrine upon which the *Robinson* rule ostensibly is premised—the law of *Terry v. Ohio* and its progeny.

## II.    Analysis

### A.    Governing Law

Hicks' claim sounds in the protection from unlawful searches and seizures guaranteed by the Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and by Article I, Section 8, of the Pennsylvania Constitution.[5]  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

Whether the Superior Court's bright line rule holding that possession of a concealed firearm in public is sufficient to create reasonable suspicion is a matter of such substantial public importance as to require prompt and definitive resolution by the Pennsylvania Supreme Court?

*Commonwealth v. Hicks*, 172 A.3d 583 (Pa. 2017) (*per curiam*).

[5]    Hicks also invokes his constitutional right to keep and bear arms, guaranteed under the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution.  *See* U.S. CONST. amend. II ("A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); PA. CONST. art. I, § 21 ("The right of the citizens to bear arms in defence of themselves and the State shall not be questioned.").  Although the right to keep and bear arms serves as an important conceptual backdrop to numerous legal issues surrounding firearms and the enforcement of the criminal law, our analysis will not focus upon the contours of that right.  The issue presented is one of law enforcement practice, and the constitutional right at issue is the freedom from unreasonable, warrantless seizure of the person for purposes of criminal investigation. As such, this case is governed by the Fourth Amendment's *Terry* doctrine, not by the right to keep and bear arms.

U.S. CONST. amend. IV. Pennsylvania's constitutional provision, similar in its phrasing but distinct in the nature and scope of its protections, provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8. Although it is beyond cavil that Article I, Section 8, of the Pennsylvania Constitution provides broader protection from unreasonable searches and seizures than its federal counterpart, *see generally Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), this Court long has held that the *Terry* doctrine "sets forth the reasonableness standard for Article I, § 8 of the Pennsylvania Constitution." *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010); *see Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997) (noting that "Pennsylvania has always followed *Terry* in stop and frisk cases"). Accordingly, and because Hicks does not aver that our Constitution compels a different result, we need not conduct separate analyses of the applicable constitutional provisions.

> Our standard of review of an order denying suppression is well-settled:
>
> When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Jackson*, 698 A.2d at 572 (quoting *Commonwealth v. Cortez*, 491 A.2d 111, 112 (Pa. 1985)). Although we will return to the suppression court's factual findings in order to resolve the instant appeal, our principal task is to review the lower courts' application of

the *Robinson* rule—treated as dispositive of the lawfulness of a seizure even absent any other facts suggesting criminal activity. This is a pure question of law. "As an appellate court, we are not bound by the suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Wilmer*, 194 A.3d 564, 567 (Pa. 2018).

Because the conduct to which the *Robinson* rule applies is regulated and authorized by statute, we begin with a brief review of the law relating to the carrying of firearms in this Commonwealth. The statutes providing for the sale, transfer, possession, and carrying of firearms are set forth in the Pennsylvania Uniform Firearms Act of 1995, 18 Pa.C.S. §§ 6101-27 ("UFA"). In this Commonwealth, firearms lawfully may be possessed by any individual not prohibited to do so under 18 Pa.C.S. § 6105 or otherwise barred by federal law. With the exception of certain locations such as school property or court facilities, where the possession of weapons is prohibited by statute, *see, e.g.*, 18 Pa.C.S. §§ 912-13, firearms lawfully may be carried in public in all parts of Pennsylvania. The manner of their carrying, however, is subject to certain statutory limitations and licensing requirements.

Except in Philadelphia, no license is required in order to carry a firearm openly on one's person. However, a county-issued license to carry a firearm is required for the carrying of a firearm "in any vehicle" or "concealed on or about" one's person, and carrying in such a manner "without a valid and lawfully issued license" constitutes a criminal offense, generally graded as a third-degree felony. 18 Pa.C.S. § 6106(a). The issuance of a license to carry a firearm, of course, exempts an individual from the limitations of Section 6106, and expressly authorizes the carrying of a firearm "concealed on or about one's person or in a vehicle throughout this Commonwealth." 18 Pa.C.S. § 6109(a). A license to carry a firearm further authorizes an individual to carry a firearm openly or

concealed within the City of Philadelphia. 18 Pa.C.S. § 6108.[6] Accordingly, "[i]n all parts of Pennsylvania, persons who are licensed may carry concealed firearms." *Commonwealth v. Hawkins*, 692 A.2d 1068, 1071 n.4 (Pa. 1997) (plurality). Stated otherwise, an individual licensed to carry a firearm may do so in public, openly or concealed, within a vehicle or without, throughout every municipality in Pennsylvania.

Under Pennsylvania law, there can be no doubt that a properly licensed individual who carries a concealed firearm in public engages in lawful conduct. Indeed, millions of people lawfully engage in this conduct on a daily basis, both within this Commonwealth and across the nation.[7] The Pennsylvania State Police reports that, in Pennsylvania, 237,344 licenses to carry firearms were issued in 2015; 300,565 were issued in 2016; and 290,958 were issued in 2017.[8]

---

[6] Consistent with the General Assembly's reservation of the exclusive prerogative to regulate firearms in this Commonwealth, codified at 18 Pa.C.S. § 6120, the additional requirement that an individual possess a license in order to carry a firearm openly within the City of Philadelphia is prescribed by statute, not by municipal ordinance. *See* 18 Pa.C.S. § 6108; *see generally Ortiz v. Commonwealth*, 681 A.2d 152 (Pa. 1996).

[7] *See* Royce de R. Barondes, *Conditioning the Exercise of Firearms Rights On Unlimited* Terry *Stops*, 54 IDAHO L. REV. 297, 300 (2018) (hereinafter, "Barondes") (quoting Ali Rowhani-Rahbar et al., *Loaded Handgun Carrying Among US Adults, 2015*, 107 AM. J. PUB. HEALTH 1930, 1930 (2017)) ("The number of holders of concealed firearms permits has grown explosively in recent years—according to a recent study, from '2.7 million in 1999 to 4.6 million in 2007, 11 million in 2014, and 14.5 million in 2016.' The study further reports '[O]ur findings suggest that nearly 9 million [U.S.] adult handgun owners carry loaded handguns monthly, approximately 3 million of whom do so every day, and that most report protection as the primary reason for carrying regardless of carrying frequency.'").

[8] *See* Pennsylvania State Police, Firearms Annual Report 2015, Appendix D; Pennsylvania State Police, Firearms Annual Report 2016, Appendix D; Pennsylvania State Police, Firearms Annual Report 2017, Appendix D. These reports are available at https://www.psp.pa.gov/firearms-information/Pages/Firearms-Information.aspx (last visited January 23, 2019).

Bearing this in mind, we turn to the authority that the *Robinson* rule heretofore has bestowed upon law enforcement with regard to individuals carrying concealed firearms, including the hundreds of thousands of Pennsylvanians licensed to do so. The *Robinson* rule envisions an encounter between a law enforcement officer and a private citizen that is not authorized by a warrant embodying a neutral and detached magistrate's determination of probable cause for a search or seizure. Although not every interaction between a citizen and a law enforcement officer implicates the Fourth Amendment, "[t]he Fourth Amendment, of course, applies to all seizures of the person, including seizures that involve only a brief detention short of a traditional arrest." *Brown v. Texas*, 443 U.S. 47, 50 (1979) (internal quotation mark omitted).

For purposes of the Fourth Amendment, a person is "seized" when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).[9] When a police officer "accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Brown*, 443 U.S. at 50 (quoting *Terry*, 392 U.S. at 16). In assessing the impression that would be given to a reasonable person, a court must determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

---

[9] The *Mendenhall* Court stressed that "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *Mendenhall*, 446 U.S. at 553-54 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)).

As this Court frequently has noted, warrantless interactions between citizens and police officers fall into three categories, distinguished one from another by consideration of whether the citizen has been "seized" within the meaning of the Fourth Amendment, the intrusiveness and extent of the seizure, and the justification therefor. The first type of interaction—a mere encounter—does not constitute a seizure. It generally involves a request for information and requires no particular suspicion of criminality because it carries "no official compulsion to stop or to respond." *Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995) (citing *Florida v. Royer*, 460 U.S. 491 (1983); *Bostick*, *supra*). During a mere encounter, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554.

We recognize only two types of lawful, warrantless seizures of the person, both of which "require an appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a 'stop and frisk' based upon reasonable suspicion." *Commonwealth v. Melendez*, 676 A.2d 226, 228 (Pa. 1996) (quoting *Commonwealth v. Rodriquez*, 614 A.2d 1378, 1382 (Pa. 1992)). Here, we are concerned with this latter type of seizure—interchangeably labeled an "investigative detention," a "*Terry* stop," or, when coupled with a brief pat-down search for weapons on the suspect's person, a "stop and frisk."

"To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion." *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000). The asserted grounds for an investigative detention must be evaluated under the totality of the

circumstances. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981). So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected—such as the odor of alcohol on the breath of a driver, as occurred in the instant case. However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule. *See, e.g.*, *Melendez*, 676 A.2d at 229-30.

Although the *Robinson* rule ostensibly authorizes the ascertainment of an individual's licensing status, the encounter contemplated is not merely a request for information that a citizen is entitled to ignore. Rather, the *Robinson* rule characterizes the carrying of a concealed firearm as *per se* reasonable suspicion authorizing the use of official force to seize an individual "in order to investigate whether the person is properly licensed," *i.e.*, whether the person is committing a criminal offense under 18 Pa.C.S. § 6106. *Robinson*, 600 A.2d at 959. Thus, the encounter envisioned by the *Robinson* rule is ostensibly an investigative detention, and, as such, a seizure governed by the Fourth Amendment's *Terry* doctrine.

B.    **The Parties' Arguments**

Hicks contends that, because an investigative detention must be premised upon reasonable suspicion of criminal activity, and because Pennsylvania law provides for the lawful carrying of firearms, "mere possession of a weapon, concealed or otherwise, is not 'criminal conduct,' nor is it inherently indicative of criminal activity afoot." Brief for Hicks as 12. Hicks further argues that the *Robinson* rule not only misapplied the *Terry* doctrine, but also reflected a misreading of the Superior Court's opinion in *Commonwealth v. Mears*, 424 A.2d 533 (Pa. Super. 1981), and this Court's opinion in *Commonwealth v.*

*Lagana*, 537 A.2d 1351 (Pa. 1988). *See* Brief for Hicks at 13-15. In Hicks' view, the *Robinson* rule was flawed from its inception.

Finally, Hicks argues that, without recourse to the erroneous *Robinson* rule, no information available to the officers would allow for a finding of reasonable suspicion of criminality. Rather, Hicks notes that, as confirmed by the camera operator's video footage and the police radio broadcasts (submitted into evidence at the suppression hearing as Defense Exhibit 1 and 2, respectively), Hicks merely entered and exited a retail establishment, got into his vehicle, and attempted to drive away. Brief for Hicks at 16. Because none of this conduct gave rise to a reasonable suspicion that criminal activity was afoot, Hicks asserts that the police officers' seizure of his person violated the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution, and the evidence that the officers derived from that seizure therefore must be suppressed.[10]

The Commonwealth, by contrast, asserts that the *per se* approach of *Robinson* is a justifiable application of the *Terry* doctrine. Although the Commonwealth does not dispute the legality of carrying firearms in public throughout Pennsylvania, it emphasizes that, under the totality of the circumstances, "wholly lawful conduct might justify the suspicion that criminal activity [is] afoot." Brief for Commonwealth at 5 (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (*per curiam*)). The Commonwealth further stresses that the reasonable suspicion standard "does not deal with hard certainties, but with probabilities." *Id.* at 6 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The

---

[10] Hicks' position is supported by several *amici curiae*, including Members of the Pennsylvania General Assembly, Firearms Owners Against Crime, the Firearms Policy Coalition, and the Firearms Policy Foundation. Hicks' *amici* argue that the *Robinson* rule is contrary to this Court's precedent and to the general teachings of the Supreme Court of the United States' Fourth Amendment jurisprudence. *Amici* further point to numerous decisions of the courts of other states and federal appellate courts that have addressed the specific question at issue here, and which have held that mere possession of a concealed firearm provides no basis for an investigative detention.

assessment of reasonable suspicion, the Commonwealth highlights, "must be based on common[ ]sense." *Id.* at 9 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). This "common sense," the Commonwealth posits, "would seem to prescribe . . . the fact that a person is observed carrying a concealed weapon in public would warrant a simple request by a police officer to determine whether or not the person is licensed." *Id.*

Reiterating its central premise regarding the potentially suspicious nature of lawful conduct, the Commonwealth stresses that *Terry*, itself, involved "purely legal activity," *i.e.*, walking along a public street and peering through a store's windows. *Id.* at 11. Although this conduct was not *ipso facto* criminal, the facts of *Terry* gave rise to reasonable suspicion that the individuals may have been "casing" the store in preparation for a robbery. Similarly, the Commonwealth asserts:

> Notwithstanding that carrying a firearm is a legal act in Pennsylvania, common[ ]sense dictates where police are confronted with a person carrying a firearm **concealed** in his waistband and car while in public, an officer is not only justified, but duty bound to conduct a brief detention to ascertain that individual's license to do so.

*Id.* (emphasis in original).

Although several of this Court's previous decisions have found no justification for investigative detentions based upon anonymous reports of individuals in possession of firearms, *see Jackson*, 698 A.2d at 575; *Hawkins*, 692 A.2d at 1070-71 (plurality), the Commonwealth attempts to distinguish those cases based upon the anonymous nature of the tips at issue in those cases. *See* Brief for Commonwealth at 14-15. Finally, the Commonwealth maintains that, even absent application of *Robinson*'s categorical approach to concealed firearms, "there was additional information that serve[d] to bolster the officers' reasonable suspicion and justified their actions." *Id.* at 16. The available information, the Commonwealth asserts, was:

[A]t 3:00 a.m., police received information from the operator of a city owned surveillance camera that an individual at the Gulf Station displayed a firearm to another patron at the station, and that the person with the firearm was driving a silver Chev[rolet] Impala. The video from the camera clearly shows the firearm concealed in [Hicks'] waistband and that, despite the hour, there are a number of individuals at this location. Officer Pammer also testified that the Gulf Station is located in a high crime neighborhood, where police regularly receive calls regarding drug dealing, people with weapons and loitering.

*Id.* (citations to Notes of Testimony omitted).[11]

## C. Discussion

### i. This Court's Precedent

Although this Court has not addressed the sort of *per se* rule that *Robinson* endorses, we have considered the existence of reasonable suspicion in the so-called

---

[11] The Pennsylvania District Attorneys Association ("PDAA") filed an *amicus curiae* brief in support of the Commonwealth. Like the Commonwealth, the PDAA seeks to distinguish previous decisions of this Court based upon the absence of an anonymous tip in this case, and further disputes any reliance upon our plurality decision in *Hawkins*.

With regard to the validity of the *Robinson* rule under general Fourth Amendment principles, however, the PDAA first opines that it is "eminently reasonable" for police officers to "conduct a brief investigation" of individuals in possession of concealed firearms "for the purpose of ascertaining that the individual is not unlawfully possessing the firearm." *Amicus* Brief for PDAA at 12. However, in apparent disagreement with the argument advanced throughout the Commonwealth's principal brief, PDAA then clarifies that "it is not the position of your *amicus* that every person who is carrying a concealed weapon must be interdicted and investigated, but when the facts known to the officer support the belief that the person may be unlawfully possessing a concealed firearm, he should be permitted to conduct the investigation." *Id.* at 13.

Finally, PDAA asserts that, notwithstanding application of the *Robinson* rule, the seizure of Hicks nonetheless was supported by reasonable suspicion of criminal activity. Like the Commonwealth, PDAA focuses upon Hicks' presence in a high crime area during early-morning hours. PDAA additionally emphasizes its understanding that Hicks' firearm was concealed in his waistband without a holster, a fact that it asserts is "inconsistent with lawful possession." *Id.* at 14. However, this latter assertion of fact is wholly inaccurate, as a plain reading of the suppression court's findings of fact reveals that, during the seizure, police officers "removed the firearm *from a holster* on [Hicks'] person." Order, 9/18/2015, at 2 n.1 (emphasis added).

"man with a gun" scenario, in which police receive a report from an anonymous source that there is an armed individual at a given location. In light of the parties' disparate views of this Court's earlier precedents, the most natural place to begin our analysis is this Court's decision in *Lagana*—a case of particular relevance to the question presented here, in that the *Robinson* court reasoned that its *per se* approach to concealed firearms was merely an express articulation of what it viewed as the "implicit foundation" of *Lagana*. *See Robinson*, 600 A.2d at 959 ("The implicit foundation of . . . *Lagana* is that possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed.").

In *Lagana*, this Court held that an investigative detention was supported by reasonable suspicion of criminal activity where the police received an anonymous report of an armed individual wearing a yellow raincoat at a specified location and, upon their arrival, officers observed an individual matching the description who was "casing" a restaurant with a pair of binoculars. *Lagana*, 537 A.2d at 1354-55. The *Lagana* Court indeed referred to the potential dangers that an armed individual may pose to public safety. *Id.* at 1354. However, this Court emphasized the particular behavior that the police officers observed when they arrived at the location identified by the anonymous tip, where they "discovered a white male in his early twenties wearing a yellow raincoat who made his presence even more obvious because he was casing a business establishment with a pair of binoculars in the pouring rain." *Id.* Thus, the officers' observations not only corroborated the description of the individual reported, but established that he was engaged in "suspicious conduct under the circumstances," which justified the initiation of an investigative detention. *Id.*

This Court clarified *Lagana*'s reasoning in *Jackson*, making clear that the presence of a concealed firearm was not dispositive in *Lagana*:

> While the suggestion was indeed made in *Lagana*, that the risk posed by firearms should be factored into the reasonable suspicion analysis, that observation was *dictum*. In *Lagana*, an anonymous caller provided the police with a description and location of the suspect, and stated that he was armed. When the police arrived, they observed the suspect "casing" a store using binoculars, which is precisely the sort of suspicious activity which arose in *Terry* itself. The police therefore already had the requisite reasonable suspicion to stop and frisk Mr. Lagana, even absent any allegation that he was armed.

*Jackson*, 698 A.2d at 575. Because the suspicion in *Lagana* hinged upon the "casing" of a business establishment rather than the mere possession of a concealed firearm, the *Robinson* court's inference regarding the "implicit foundation" of *Lagana* was unwarranted.

In *Hawkins*, this Court, albeit in a plurality opinion, more directly addressed and rejected the notion that the mere possession of a firearm may constitute grounds for an investigative detention. Like *Lagana*, *Hawkins* involved an anonymous report of a man who possessed a firearm. Chief Justice Flaherty, writing for the Court and joined by Justices Zappala and Cappy—with Justice Nigro concurring in the result but not writing separately—opined that the anonymous tip at issue was not corroborated sufficiently, and that the police "had no independent reason to believe that the suspect may have been involved in criminal activity." *Hawkins*, 692 A.2d at 1071 (plurality).

In *Hawkins*, the Commonwealth argued that, notwithstanding the absence of any facts providing an independent basis for a finding of reasonable suspicion, the "police have a duty to stop and frisk when they receive information from any source that a suspect has a gun." *Id.* The lead opinion described the Commonwealth's position as "radical" and inconsistent with Pennsylvania law, which provides for the licensed carrying of

firearms. *Id.* The *Hawkins* plurality opined that the Commonwealth's position would not comport with the Pennsylvania Constitution, and further would seem "more likely to endanger than to protect the public" inasmuch as "[u]necessary police intervention, by definition, produces the possibility of conflict where none need exist." *Id.*

*Hawkins* is a non-binding plurality decision, which can be considered for its persuasive value only. However, only three months later, this Court decided *Jackson*, which we stated was "factually indistinguishable from *Hawkins*." *Jackson*, 698 A.2d at 575. *Jackson*, like *Lagana* and *Hawkins*, addressed an anonymous report of a man with a gun. The anonymous tipster did not describe any suspicious conduct beyond the possession of a firearm and, unlike in *Lagana*, the responding officer did not observe any suspicious conduct when he located the reported individual. *Id.* at 572 ("There is no contention that the appellant was acting suspiciously."). This Court concluded that, in the absence of any suspicious activity, the mere identification of an individual matching the description provided in the anonymous tip was an insufficient basis upon which to conduct an investigative detention. *Id.* at 575.

In *Jackson*, the Commonwealth revisited the "radical position" that it had offered in *Hawkins*. This time, a Majority of the Court resoundingly rejected the Commonwealth's proposition:

> The Commonwealth contends . . . that the degree of danger to the police and the public from armed criminals is so great that if an anonymous caller provides a physical description of the individual, an accurate location and an allegation that the individual is armed, a *Terry* stop is justified. That argument will not withstand constitutional scrutiny. The danger to the police and public from firearms was already factored into the balance when the requirement of reasonable suspicion was articulated in *Terry*. To adopt the position that the Commonwealth urges is in reality to overrule *Terry* in favor of a lower standard of protection under the state and federal constitutions, a decision that we are not empowered to make.

*Jackson*, 698 A.2d at 575.

Unlike *Hawkins*, *Jackson* is binding precedent in this Court. Importantly, as noted above, *Jackson* clarified that the lawfulness of the investigative detention in *Lagana* was not dependent upon the presence or absence of a firearm, but rather was justified by the police officers' observations of the particular suspect's conduct. Consequently, Hicks is correct that the *Robinson* rule is not an accurate articulation of the "implicit foundation" of *Lagana*. *Robinson*, 600 A.2d at 959. Moreover, *Jackson*'s rejection of the Commonwealth's categorical approach to the seizure of individuals in possession of firearms casts a considerable shadow over the validity of the *Robinson* rule. However, *Lagana*, *Hawkins*, and *Jackson* may only take us so far, in that each case, as the Commonwealth and its *amicus* highlight, involved an anonymous tip—an additional fact that implicates distinct questions regarding the reliability of the information upon which police officers act.

As such, we will afford the Commonwealth the benefit of the doubt and conclude that *Jackson* is at least arguably distinguishable from the question at bar due to the additional considerations that attend the evaluation of anonymous tips, which were at issue in *Lagana*, *Hawkins*, and *Jackson*, but have no application herein. We accordingly proceed to address the validity of the *Robinson* rule upon its own merits, notwithstanding its origin as an erroneous extension of *Lagana*.

Before this Court, the Commonwealth again advanced its "radical position," *Hawkins*, 692 A.2d at 1071, in the present iteration contending that police officers are not only entitled, but "*duty bound*" to seize and investigate the licensing status of every individual who carries a concealed firearm in Pennsylvania. Brief for Commonwealth at 11. We have little difficulty in again rejecting this proposition, because we conclude that the *Robinson* rule contravenes the *Terry* doctrine and, indeed, the fundamental guarantees of the Fourth Amendment.

### ii.    The *Terry* Doctrine's Criminality Predicate

First, as is manifest from its very phrasing, the *Robinson* court's analysis of the basis for a *Terry* stop overlooks the initial and essential prerequisite that justifies the seizure. Prior to the acquisition of any evidence arising from an investigative detention, the seizure of the person must be "justified at its inception." *Terry*, 392 U.S. at 20. The *Terry* Court was careful to maintain the distinctions between, and the constitutional significance of, the separate events of the "stop," "arrest," or "seizure" of the person and the "frisk" or "search" of that person, stressing that the analysis cannot be permitted to "isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen." *Id.* at 17. The *Terry* decision introduced the now-familiar "reasonable suspicion" standard, allowing a police officer to stop an individual based upon "specific and articulable facts" and "rational inferences from those facts" that warrant a belief that the individual is involved in criminal activity. *Id.* at 21. *Terry* further allows a limited search for weapons where "an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Id.* at 24.

Concurring in *Terry* to "fill in a few gaps" in the Court's opinion, Justice Harlan stressed that, "[i]n the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop." *Id.* at 31-32 (Harlan, J., concurring). Justice Harlan sought to "make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." *Id.* at 33.

Although the *Terry* decision focused primarily upon the legality of the "frisk" rather than the "stop," the United States Supreme Court subsequently has made "perfectly clear," *id.*, that Justice Harlan correctly articulated the law of investigative detentions.

*See, e.g.*, *Cortez*, 449 U.S. at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). More recently, in *Arizona v. Johnson*, the Court articulated the distinct standards for a "stop" and a "frisk" with unmistakable clarity:

> The [*Terry*] Court upheld "stop and frisk" as constitutionally permissible if two conditions are met. *First*, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. *Second*, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Johnson*, 555 U.S. at 326-27 (emphasis added).

The Superior Court's holding in *Robinson* clearly subverts this fundamental principle. Rather than requiring reasonable suspicion of criminal activity to justify the initial "stop," the *Robinson* rule conflated that necessary antecedent with the justification for the "frisk." The court reasoned that possession of a concealed firearm in public "is sufficient to create a reasonable suspicion that the individual may be *dangerous*," which, in turn, the court concluded, allows an officer to "briefly detain him in order to investigate whether the person is properly licensed." *Robinson*, 600 A.2d at 959 (emphasis added). However, even presuming dangerousness, "dangerous" is not synonymous with "criminal." As set forth above, a reasonable belief that a suspect is armed and dangerous allows for a limited search for weapons only *after* the police officer ascertains specific and articulable facts to support a finding of reasonable suspicion that criminal activity is afoot, so as to justify the intrusion of an investigative detention in the first instance. Mere "dangerousness" is simply an insufficient basis upon which to conduct a *Terry* stop. This was precisely Justice Harlan's point in *Terry*, and it is a clear line that has been drawn throughout the Court's subsequent decisions.

The *Robinson* rule purports to deem constitutional the seizure of persons upon a basis manifestly inconsistent with the Fourth Amendment jurisprudence that has governed interactions between citizens and law enforcement for five decades. However, although the conflation of dangerousness with criminality is a palpable flaw in the *Robinson* rule, its effect would be the same if, for some other reason, a police officer is entitled to infer that an individual carrying a concealed firearm is engaged in some type of unlawful conduct, such that an investigative detention would be "justified at its inception." *Terry*, 392 U.S. at 20. Some courts have so held. Because the essence of the *Robinson* rule is that possession of a concealed firearm establishes a lawful basis for an investigative detention, we now evaluate this proposition, and the problematic consequences that follow.

### iii.    The *Terry* Doctrine and the Carry of Firearms

We are, of course, not the first Court to address the Fourth Amendment ramifications of criminal laws relating to the carrying of firearms. We stress, however, that our present analysis is confined to the antecedent justification for a "stop," and we accordingly offer no opinion as to whether a police officer who has effectuated a lawful investigative detention may treat the suspect's possession of a firearm as *per se* authorization to "frisk" the detainee. Accordingly, decisions addressing that separate question, and the consideration of whether an "armed" individual is automatically "dangerous" for purposes of a *Terry* frisk, *see, e.g.*, *United States v. Robinson*, 846 F.3d 694 (4th Cir. 2017) (*en banc*), have no relevance to this appeal. As discussed throughout this Opinion, these inquires are distinct.[12]

---

[12]    *See generally* J. Richard Broughton, *Danger at the Intersection of Second and Fourth*, 54 IDAHO L. REV. 379 (2018) (hereinafter, "Broughton") (discussing recent case law addressing firearms and the *Terry* doctrine, with particular emphasis on the justification for a frisk).

The Supreme Court of the United States has declined to recognize a "firearm exception" to the requirements of *Terry*. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000) ("A second major argument advanced by Florida and the United States as *amicus* is, in essence, that the standard *Terry* analysis should be modified to license a 'firearm exception.' . . . We decline to adopt this position."). However, as in *Lagana*, *Hawkins*, and *Jackson*, the Court's decision in *J.L.* dealt with an anonymous tip, and the "firearm exception" that the Court rejected was essentially the same proposition that this Court rejected in *Jackson*—that "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." *Id.* That is, the Court's rejection of the proposition was grounded upon the reliability inquiries attending anonymous tips, not the distinct question of whether the mere possession of a firearm, however discerned, may establish a *per se* basis for an investigative detention. Accordingly, as with *Jackson*, we will not treat the *J.L.* Court's rejection of the proposed "firearm exception" as alone dispositive of the *Robinson* rule's validity.

Numerous state courts and federal Courts of Appeals, however, have considered Fourth Amendment seizures based solely upon the possession of firearms, with a particular eye toward the lawfulness of such activity under the statutes of the subject jurisdiction. In *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), the Fourth Circuit reasoned:

> Being a felon in possession of a firearm is not the default status. More importantly, where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states. *United States v. King*, 990 F.2d 1552, 1559 (10th Cir.1993).

*Id.* at 540. The Tenth Circuit's decision in *King*, which the *Black* court cited, similarly held that the interest in the safety of police officers and bystanders did not justify the detention

of a motorist immediately upon observation of a firearm, reasoning that "[i]n a state such as New Mexico, which permits persons to lawfully carry firearms, the government's argument would effectively eliminate Fourth Amendment protections for lawfully armed persons." *King*, 990 F.2d at 1559.

Likewise in *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128 (6th Cir. 2015), the Sixth Circuit found unlawful the detention of an individual based upon his open carrying of a firearm, reasoning in part:

> While open-carry laws may put police officers . . . in awkward situations from time to time, the Ohio legislature has decided its citizens may be entrusted with firearms on public streets.  The Toledo Police Department has no authority to disregard this decision—not to mention the protections of the Fourth Amendment—by detaining every "gunman" who lawfully possesses a firearm.

*Id.* at 1133 (citation omitted).

In a case arising in the Virgin Islands, where the possession of a firearm in public was lawful, the Third Circuit rejected an assertion that such possession alone gave rise to reasonable suspicion of criminality.  *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000).  An anonymous tip that Ubiles possessed a firearm at a public event, the court found, although accurate, provided "no reason to believe that Ubiles was engaged in or planning or preparing to engage in illegal activity due to his possession of a gun." *Id.* at 218.  The *Ubiles* court provided an analogy to the lawful possession of a different object—a wallet, which may or may not contain unlawful counterfeit bills.  *Id.*  The mere possibility that a wallet could contain counterfeit bills, the *Ubiles* court reasoned, does not entitle a police officer to infer their presence in the absence of reasonable, articulable suspicion.

Courts of some jurisdictions have analyzed the question based upon whether, under applicable statutes, nonlicensure is an *element* of the crime of carrying a firearm without a license—in which case a *Terry* stop for mere possession is unlawful—or

whether licensure serves as an *affirmative defense* to the criminal charge—in which case a *Terry* stop is lawful. *See generally* Barondes, *supra* n.7, at 326-41. In *State v. Timberlake*, 744 N.W.2d 390 (Minn. 2008), the Minnesota Supreme Court reasoned that, under Minnesota's statute, "the nonexistence of a permit is not an element of the crime," and "the permit holder has the obligation to provide evidence of his permit as a way to avoid criminal responsibility." *Id.* at 396. Accordingly, the Court deemed it lawful for a police officer to seize an individual in Minnesota based solely upon a reliable report of his possession of a firearm in a vehicle. *Id.* at 397. Applying this approach in *United States v. Gatlin*, 613 F.3d 374 (3d Cir. 2010), the Third Circuit distinguished its decision in *Ubiles* and reasoned that, under Delaware law, because the existence of a license to carry a firearm is a *defense* to the crime of carrying a concealed firearm, an investigative detention based solely upon the possession of a concealed firearm is permissible. *Id.* at 378 ("[U]nder Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise.").[13]

The Supreme Court of the United States has not addressed whether this element-or-defense approach to concealed carry licenses is acceptable under Fourth Amendment principles. Although by no means intended as an exhaustive survey of the decisions applying this litmus, this brief discussion is amply sufficient for this Court to conclude that

---

[13] Although we treat decisions of the Third Circuit as persuasive authority on questions of federal constitutional law, we are not bound thereby. *See Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien*, 908 A.2d 875, 883 n.10 (Pa. 2006). The Supreme Court of the United States remains "the ultimate authority" in matters of federal constitutional jurisprudence. *Purple Orchid, Inc. v. Pa. State Police*, 813 A.2d 801, 806 (Pa. 2002); *see also Commonwealth v. Cross*, 726 A.2d 333, 338 n.4 ("This [C]ourt is not bound by a lower federal court's interpretation of United States Supreme Court decisions, but is bound only by the United States Supreme Court."). For the reasons discussed throughout this Opinion, and addressed in further detail in Part II(C)(vi), *infra*, we decline to follow the Third Circuit's approach in *Gatlin*.

we do not find the approach persuasive. To characterize an investigative detention as lawful solely because licensure is an affirmative defense under the applicable statute, rather than nonlicensure serving as an element of the crime, is to obscure the fact that licensed individuals who engage in the conduct for which they have obtained licenses are, at bottom, in compliance with the requirements of the law. Accordingly, notwithstanding how such a test may apply to Pennsylvania's statutes, we find the element-or-defense approach "ultimately untenable, because it would allow a manifestly unacceptable range of ordinary activity to, by itself, justify *Terry* stops." Barondes, *supra* n.7, at 346.

We find much greater appeal in decisions of our sister states such as *Commonwealth v. Couture*, 552 N.E.2d 538 (Mass. 1990), and *Pinner v. State*, 74 N.E.3d 226 (Ind. 2017), which apply a more straightforward analysis of Fourth Amendment principles. Even though Massachusetts was a "defense" state and not an "element" state, the Supreme Judicial Court of Massachusetts in *Couture* held that the "mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun, and the stop was therefore improper under Fourth Amendment principles." *Couture*, 552 N.E.2d at 541. Recently, in *Pinner*, the Supreme Court of Indiana reached an identical conclusion with nary a mention of the element-or-defense approach. *See Pinner*, 74 N.E.3d at 230-34.

Our analysis of the question at bar is guided by fundamental Fourth Amendment principles. We find no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public. As set forth, above, it is not a criminal offense for a license holder, such as Hicks, to carry a

concealed firearm in public.[14]  Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, *see* 18 Pa.C.S. §§ 6105-06, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance.  As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal.  Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there

---

[14]     Regarding the legality of concealed carry within a given jurisdiction, as it relates to the distinction between stops and frisks under the *Terry* doctrine, Broughton observes:

> Gun rights law . . . can still receive meaningful protection under *Terry* doctrine, but most of its work is performed at the initial stage of the encounter.  The liberalization of gun rights can function as a limit on the scope of the initial stop, as in cases like *Northrup* or *Black*.  But once a legally sufficient justification has been established for the stop—reasonable suspicion that the suspect has committed a crime or that criminal activity is afoot—the fact that the jurisdiction liberally permits gun possession and public carry has less force.  The liberalization of gun law, whether via the Second Amendment, state legislation, or state constitutional law, relates to *Terry*'s criminality predicate because the law enforcement justification for the stop is drawn from an objective indicator—whether something is legal or illegal, which is (or ought to be) knowable to the investigating officer.  Of course, the officer need only be reasonably suspicious of criminality, not certain.  But still, his judgment about whether to conduct the stop will be made based on his understanding of what the law objectively requires or permits.   The decision whether to frisk—and the dangerousness determination that accompanies it—is different.   It requires reasoned judgments based on factors that may arise during the stop or that are based on the officer's experience, judgments that often must be made "even quicker" and "on less information" than is available with respect to the stop.

Broughton, *supra* n.12, at 404-05 (emphasis and footnotes omitted).

simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

Responding to the Commonwealth's principal arguments to the contrary requires us to examine additional deficiencies in the *Robinson* rule, which further highlight the dangers inherent in applying *per se* rules—generally disfavored under the Fourth Amendment, *see United States v. Drayton*, 536 U.S. 194, 201 (2002)—to validate seizures. The *Robinson* rule improperly dispenses with the requirement of individualized suspicion and, in so doing, misapplies the overarching totality of the circumstances test.

### iv. Operation as a *Per Se* Rule

The Fourth Amendment protects a fundamentally individual right—the "right of each individual to be let alone." *Tehan v. U.S. ex rel. Shott*, 382 U.S. 406, 416 (1966).[15] Ordinarily, a governmental intrusion upon that individual right requires an individualized justification; otherwise, a search or seizure is constitutionally unreasonable. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.").

Notably, the type of seizure contemplated here does not implicate a scenario involving "special needs, beyond the normal need for law enforcement," *Edmond*, 531 U.S. at 37, such as would dispense with the requirement of individualized suspicion. Although a general requirement in the Fourth Amendment context, the Supreme Court of the United States has held that individualized suspicion is not "an 'irreducible' component of reasonableness" in all situations. *Id.* (quoting *Martinez-Fuerte*, 428 U.S. at 561).

---

[15] *See Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting) (noting that the framers of the Constitution "conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men"); *see generally* Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890) (discussing the "right to be let alone" as a foundational principle of American jurisprudence).

However, the Court has recognized "only limited circumstances in which the usual rule does not apply." *Id.* This is not one of those circumstances. Pursuant to *Edmond*, the Fourth Amendment will not tolerate the abandonment of individualized suspicion for searches primarily designed to "uncover evidence of ordinary criminal wrongdoing." *Id.* at 42. There has been no suggestion that the investigation of individuals carrying concealed firearms constitutes a special need beyond the "general interest in crime control." *Id.* at 41 (quoting *Delaware v. Prouse*, 440 U.S. 648, 659 n.18 (1979)). Accordingly, the "usual rule," as *Edmond* called it, remains in full force herein, and individualized suspicion of wrongdoing remains essential under the Fourth Amendment.

The individualized nature of the justification for a seizure is central to the *Terry* doctrine, inherent in the requirement that an investigative detention must be premised upon specific and articulable facts particular to the detained individual. Indeed, the *Terry* Court stressed that the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18; *see Martinez-Fuerte*, 428 U.S. at 560-61 (citing the quoted passage of *Terry* for the proposition that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure").

Naturally, judicial assessment of the justification for a seizure must be conducted under the "totality of the circumstances," which includes consideration of all of the facts and circumstances, including rational inferences derived from those facts, that bear upon a reasonable officer's belief as to whether criminal activity may be afoot. *See*, *e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). Nonetheless, in general, some particularized basis for believing that an individual is engaged in criminal conduct remains a necessary antecedent to an investigative detention. In *Cortez*, the Court addressed the

standards pursuant to which an individual's conduct may be found sufficiently suspicious to justify a stop under the totality of the circumstances:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a *particularized and objective basis for suspecting the particular person stopped of criminal activity.*

*Cortez*, 449 U.S. at 417-18 (emphasis added).

The *Robinson* rule neglects this principle. The error lies not in any assertion that the possession of a firearm can *never* be suspicious—it certainly can be. A police officer is entitled to view individuals' conduct in light of the "probabilities" that criminal activity may be afoot, and indisputably may draw "certain common sense conclusions about human behavior." *Id.* at 418. Relevant contextual considerations may include factors such as a suspect's presence in a high crime area. *See, e.g.*, *Adams v. Williams*, 407 U.S. 143, 147-48 (1972), *but see Wardlow*, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

The deficiency in the *Robinson* rule is that, rather than requiring a "particularized and objective basis" for suspecting an individual, *Cortez*, 449 U.S. at 417, the Superior Court has deemed the conduct of the individual to be functionally irrelevant to the analysis. Such is a danger of *per se* rules, pursuant to which the totality of the circumstances inquiry—the whole picture—is subordinated to the identification of one, single fact. This is distinctly problematic where, as discussed above, the single fact isolated from the remainder of the circumstances is an activity that is indistinguishable

from lawful conduct. Under the *Robinson* rule, consideration of the individual has been substituted for categorical treatment of a rather large class—all persons carrying concealed firearms, whether they are licensed to do so or not. *Robinson* would subject every member of this class to seizure by law enforcement agents, with no further consideration of "the whole picture" of the circumstances with respect to a particular individual's conduct. In failing to demand "specificity in the information upon which police action is predicated," the *Robinson* rule thus confounds "the central teaching of . . . Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18.

The Commonwealth's arguments fare no better. The Commonwealth places great emphasis upon the notions that "there could . . . be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot," *Reid*, 448 U.S. at 441 (*per curiam*), and that reasonable suspicion "does not deal with hard certainties, but with probabilities." *Cortez*, 449 U.S. at 418. *See* Brief for Commonwealth at 5-6, 11-12. Although these propositions surely are correct, they are inadequate to justify the seizures contemplated by the *Robinson* rule, and fail to account for the gravity of the authority that the Commonwealth claims for itself.

The probabilistic nature of the inquiry, as discussed in *Cortez*, merely guides the totality of the circumstances test, which, as noted above, nonetheless requires some "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. An officer certainly is entitled to consider "probabilities" and to employ "common sense," but, quite fundamentally, "the whole picture" of the circumstances "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418. As for the Commonwealth's contention regarding the potentially suspicious nature of lawful conduct, a brief review of *Reid*— which the Commonwealth cites for the proposition—reveals the flaws in Commonwealth's

position, while simultaneously illustrating the correct manner in which to weigh probabilities, innocent conduct, and common sense, under the "whole picture" of the totality of the circumstances.

In *Reid*, an agent of the federal Drug Enforcement Agency detained Reid and his companion at an airport, based upon his belief that Reid fit a "drug courier profile." *Reid*, 448 U.S. at 440 (*per curiam*). The lower court focused upon the fact that Reid and his companion arrived from Fort Lauderdale during early morning hours, had no luggage other than shoulder bags, and that Reid occasionally glanced at his companion while, in the opinion of the agent, attempting to conceal the fact that they were traveling together. The Supreme Court of the United States analyzed this evidence purportedly giving rise to reasonable suspicion as follows:

> We conclude that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. *The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.* Nor can we agree, on this record, that the manner in which the petitioner and his companion walked through the airport reasonably could have led the agent to suspect them of wrongdoing. Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, see *Terry*, 392 U.S. at 27-28, this is not such a case. The agent's belief that the petitioner and his companion were attempting to conceal the fact that they were traveling together, a belief that was more an "inchoate and unparticularized suspicion or 'hunch,'" *Id.* at 27, than a fair inference in the light of his experience, is simply too slender a reed to support the seizure in this case.

*Id.* at 441 (*per curiam*) (citations modified; emphasis added).

Nothing about this analysis provides even a slender reed to support the *Robinson* rule. Although wholly lawful conduct certainly may give rise to reasonable suspicion of

criminal conduct under some circumstances, and although reasonable suspicion "need not rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277, the *Terry* doctrine unequivocally requires *something* suggestive of criminal activity before an investigative detention may occur. The Commonwealth cannot simply point to conduct in which hundreds of thousands of citizens lawfully may engage, then deem that conduct to be presumptively criminal. This would, as *Reid* stated, "describe a very large category of presumably innocent travelers," many of whom surely would be surprised to learn that the very conduct for which they have obtained a license nonetheless served as the sole predicate for the deprivation of their liberty. *Reid*, 448 U.S. at 441. The instant case demonstrates precisely the dangers inherent in such an approach: Hicks was, like many other Pennsylvania citizens, licensed to engage in the activity for which he was seized. We must reject the Commonwealth's assertion that a police officer is authorized, let alone "duty bound," Brief for Commonwealth at 11, to seize and question any and every one of those people.

### v. *Delaware v. Prouse*

Finally, the *Robinson* rule cannot be salvaged by any attempt to minimize the authority contemplated by characterizing the seizure as merely a "simple request" to check a license. Brief for Commonwealth at 9. A seizure is a seizure. That the purported basis for the seizure is simply to "check" whether the suspect is committing a crime does not diminish the constitutional significance of the encounter. It does not render it any less of a seizure; it simply renders it a seizure in the absence a particularized basis for a finding of reasonable, articulable suspicion of criminal activity.

In this regard, we find significant relevance in the United States Supreme Court's decision in *Delaware v. Prouse*, 440 U.S. 648 (1979). Like the carrying of a firearm without a license, it also is unlawful to drive an automobile without a license. In *Prouse*,

the Supreme Court of the United States held that, absent reasonable, articulable suspicion that a particular motorist is unlicensed or that a particular vehicle is unregistered, and without any other independent basis to seize a vehicle or its occupants, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.* at 663.

Unlike a border checkpoint such as those approved by the Court's decision in *Martinez-Fuerte*, *supra*, the *Prouse* Court determined that the "spot check" of a particular driver must be justified by individualized suspicion. This was so despite the States' "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Prouse*, 440 U.S. at 658. Notwithstanding the extensive governmental regulation of automobiles, and despite the important governmental interest in such regulation, the Court found those "important ends" insufficient to "justify the intrusion upon Fourth Amendment interests which such stops entail." *Id.* at 659. The Court explained:

> The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry*, 392 U.S. at 22.

*Id.* at 661 (citation modified). The Court characterized the authority contemplated as the "kind of standardless and unconstrained discretion" that represents precisely "the evil the Court has discerned when in previous cases it has insisted that the discretion of the official

in the field be circumscribed, at least to some extent." *Id.* The "grave danger" of the abuse of that discretion, the Court emphasized, "does not disappear simply because the automobile is subject to state regulation," nor does "an individual operating or traveling in an automobile . . . lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Id.* at 662.

Invoking *Terry*, the *Prouse* Court concluded:

> Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio*, *supra*, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

*Id.* at 662-63.

Nor are people shorn of all Fourth Amendment protection when they carry firearms in compliance with the laws of this Commonwealth. Firearms, too, are subject to extensive governmental regulation, at both the state and federal level. Nonetheless, the possession or carrying of firearms, although unlawful for some, cannot strip away protections of the Fourth Amendment for all of the rest.

*Prouse* does more than illustrate the retention of Fourth Amendment rights despite participation in a licensed and government-regulated activity. *Prouse* highlights a first principle that lies at the heart of the Fourth Amendment—that the government may not target and seize specific individuals without any particular suspicion of wrongdoing, then force them to prove that they are *not* committing crimes. To hold otherwise would be anathema to individual liberty, and contrary to "the central teaching of . . . Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18.

### vi.    The Perspective of the Concurrence[16]

The Concurrence rejects this analysis, and would adopt the element-or-defense test referenced above, under which the seizure of an individual for engaging in licensed conduct is deemed permissible if licensure serves as an affirmative defense to a crime, as opposed to nonlicensure serving as an element of the offense. *See supra* at 26-27. The Concurrence opines that our treatment of this test is unduly dismissive given its prevalence in other jurisdictions, that our rejection thereof fails to afford sufficient deference to the manner in which the legislature chooses to define crimes, and that our reasoning may have consequences for future investigations of other licensed conduct. These are fair observations. However, the element-or-defense test comes with its own untenable consequences. Chief among these is the fact that such a test transfers to the legislature the power to erase the protections of the Fourth Amendment for any individual who seeks to comply with the legislature's own licensing requirements.

To apprehend the constitutional infirmity of the element-or-defense test, one need look no further than *Prouse*. In addressing whether the Fourth Amendment tolerates "spot checks" of motorists' driver's licenses, the *Prouse* Court made no inquiry into whether possession of a driver's license is an affirmative defense in the subject jurisdiction, or whether nonlicensure is an element of the crime of driving without a license. The Court's concern in *Prouse* was with "unfettered governmental intrusion" upon the rights of the individual solely at the "unconstrained discretion" of a single law enforcement officer in the field. *Prouse*, 440 U.S. at 661, 663. This concern remains starkly unaddressed by the element-or-defense test, which purports to bestow upon the legislature the power to

---

[16]    In this section, usages of the "Concurrence" refer to Justice Dougherty's Concurring Opinion, and not to Justice Baer's separate writing.

authorize precisely this manner of intrusion upon the very individuals who have sought to bring themselves into compliance with the law by obtaining licenses.

Recognizing that *Prouse* casts considerable doubt upon the element-or-defense test, the Concurrence offers a distinction suggested by the Tenth Circuit in *United States v. Rodriguez*, 739 F.3d 481 (10th Cir. 2013). *See* Concurring Opinion (Dougherty, J.) at 8-9. However, *Rodriguez* itself plainly recognized the tension between *Prouse* and the element-or-defense test, opining that, "[t]o be sure, any construction of a motor vehicle statute permitting such random stops, however the statute is worded, would be unconstitutional" under *Prouse*. *Rodriguez*, 739 F.3d at 490. The *Rodriguez* court forthrightly acknowledged that, under *Prouse*, it is immaterial whether nonlicensure is an element of the crime or licensure is an affirmative defense—it remains a violation of the Fourth Amendment to detain a motorist solely to ascertain the motorist's licensing status.

In order to deem constitutional the seizure at issue, the *Rodriguez* court sought to distinguish the underlying activities subject to licensing, opining that, unlike driving a car, "concealing a handgun is a clandestine act." *Id.* Further contrasting the *Prouse* Court's conclusion that random stops of motorists would have an impact upon public safety that is "marginal at best," the *Rodriguez* court opined that, due to the danger posed by concealed weapons, it could "safely assume the contribution to public safety made by the stop of an individual known to be carrying a concealed handgun will hardly be insignificant." *Id.*

With due respect to the Tenth Circuit, *Rodriguez'* distinction is unpersuasive. The "clandestine" nature of carrying a concealed firearm is immaterial. Carrying in such a "clandestine" manner is precisely the conduct that the license authorizes. An individual licensed to carry a concealed firearm is permitted to do so every bit as much as a holder of a driver's license is permitted to operate a motor vehicle.

As for the contribution to public safety ostensibly gained by limitless seizures of armed citizens, it bears mention that the *Prouse* Court was quite aware of the dangers posed by the operation of motor vehicles, *see Prouse*, 440 U.S. at 658, yet found no justification for the suspension of Fourth Amendment rights for all motorists. The High Court could not "conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver," reasoning that such seizures embodied the "kind of standardless and unconstrained discretion" that is precisely "the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.* at 661. The *Rodriguez* panel's conclusion that it could "safely assume" the contrary in this context is speculation without any proferred empirical support, amounting to little more than an assertion that detaining armed individuals to check their licenses is desirable, whereas detaining motorists to check their licenses is undesirable—indeed, unconstitutional.

As the Concurrence emphasizes, it is certainly the legislature's prerogative to define the elements of crimes and to set forth affirmative defenses. However, the constitutionality of enforcement tactics is a matter of judicial concern. The legislature is further entitled to prescribe the requirements and procedures necessary to obtain a license for otherwise-prohibited conduct. However, the issuance of a license cannot entail the deprivation of constitutional rights. Under the element-or-defense test, the legislature is imbued with the power to limit the scope of Fourth Amendment protection.[17]

---

[17] The Concurrence characterizes this concern as "an unfounded belief the legislature may seek to circumvent the Fourth Amendment in the future." Concurring Opinion (Dougherty, J.) at 14 n.5. This is incorrect. The problem is not the unknown motivations of future legislators. Rather, the constitutional issue lies in the nature of the Concurrence's proposed legal standard, which, with respect to the licensing scheme at issue, would have the *present* effect of delegating to the legislature the judicial prerogative to assess the constitutionality of searches and seizures in particular cases.

The legislature cannot lay such a trap for the unwitting licensee, who obtains a license precisely for the purpose of achieving good-faith compliance with the law, yet who may be subject to unlimited seizures by law enforcement agents for the very conduct that the license permits. This is not a matter of deference to the legislature; this is a matter of freedom from unreasonable seizure under the Fourth Amendment.

The Concurrence also raises the specter of future difficulties with the enforcement of criminal laws, such as the prohibition upon the possession of marijuana in light of the recent passage of the Medical Marijuana Act, 35 P.S. §§ 10231.101-10231.2110. *See* Concurring Opinion (Dougherty, J.) at 12 n.4. However, even if our reasoning herein may reach to such a distinct matter—which we do not today decide—this is not a compelling reason to dilute the protections of the Fourth Amendment. Indeed, the element-or-defense test also has consequences beyond the case at bar, and these entail unacceptable limitations of Fourth Amendment rights.

For instance, the Concurrence relates this Court's conclusion in *Commonwealth v. Bigelow*, 399 A.2d 392 (Pa. 1979), that licensure is an affirmative defense under 18 Pa.C.S. § 6108, which requires a license for either open or concealed carry of a firearm within Philadelphia. *See* 18 Pa.C.S. § 6108(1) ("No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class *unless* . . . such person is licensed to carry a firearm.) (emphasis added). However, this same statutory formulation applies to the possession of prescription medication. *See* 35 P.S. § 780-113(a)(16) (defining as unlawful "[k]nowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act . . . *unless* the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner") (emphasis added). The consequence of the element-or-defense approach, then, is that an individual with a medical condition requiring

prescription medication is subject to unlimited seizures by law enforcement agents upon the mere observation of that person's medication, or her orange prescription pill bottle. This unjustly places the onus upon the citizen to demonstrate that her possession of the medication is *not* criminal, reversing the constitutional mandate that the police officer must establish a valid basis for the intrusion upon her privacy in the first instance.

The element-or-defense test amounts to a "seize now and sort it out later" approach. This is antithetical to the foundational protections of the Fourth Amendment. It casts too wide a net, with no regard for the number of law-abiding citizens ensnared within. "The *Terry* case created an exception to the requirement of probable cause, an exception whose narrow scope" the Supreme Court "has been careful to maintain." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (citation and internal quotation marks omitted). We maintain the narrow scope of that exception today. If the consequence of our decision is that future courts afford meaningful Fourth Amendment protection to individuals engaged in other commonly licensed activities, that result is preferable to our allowance of governmental overreach that undermines the individual freedom that is essential to our way of life in this constitutional republic.

Our holding is confined to the lawfulness of seizures based solely upon the possession of a concealed firearm—conduct that is widely licensed and lawfully practiced by a broad range of people. We do not render "all element-or-defense distinctions irrelevant for Fourth Amendment purposes." Concurring Opinion (Dougherty, J.) at 14 n.5. We in no way hold that the Fourth Amendment prohibits the arrest or prosecution of an individual suspected of a crime for which he may have a valid affirmative defense of, for instance, duress or the use of force in self-protection. *See generally* 18 Pa.C.S. §§ 309, 505. Rather, we merely hold that, with respect to the conduct at issue—in which hundreds of thousands of Pennsylvanians are licensed to engage lawfully, *see supra*

n.8—that conduct alone is an insufficient basis for reasonable suspicion that criminal activity is afoot. We insist only upon articulable grounds to conclude that the conduct that serves as the basis for a seizure is actually *suspicious* in any meaningful sense of the word.

In this case, as discussed in detail below, a man stopped at a gas station to fuel his vehicle, greeted an acquaintance, paid for his gasoline, and then was seized at gunpoint by numerous police officers, forcibly restrained, removed from his vehicle, and handcuffed. The *sole* basis for this seizure was his possession of a concealed firearm in public—a firearm that he was entitled to possess and licensed to carry. The injustice of this scenario would not be washed away by a mere rearrangement of statutory elements and defenses. The seizure at issue was not unconstitutional due to the statutory classification of Hicks' license; it was unconstitutional because the police officers had no way of determining from Hicks' conduct or appearance that he was likely to be unlicensed and therefore engaged in criminal wrongdoing.

The Fourth Amendment does not tolerate such indiscriminate use of law enforcement power "at the unbridled discretion of police officers." *Prouse*, 440 U.S. at 663. "The purpose of the Fourth Amendment is . . . 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *Mendenhall*, 446 U.S. at 553-54 (quoting *Martinez-Fuerte*, 428 U.S. at 554). Our holding serves that purpose. The element-or-defense test does not. Accordingly, notwithstanding the approach of some other jurisdictions, we decline to adopt the element-or-defense test as the law of this Commonwealth. Rather, the test is *Terry*, as it has been for decades, and the contours of that test are addressed thoroughly in this Opinion.

**D.   Conclusion**

Although our discussion of the arguments and legal principles has been extensive, the question presented ultimately involves a straightforward application of *Terry*. A police officer in the field naturally relies upon his or her common sense when assessing criminal activity. When many people are licensed to do something, and violate no law by doing that thing, common sense dictates that the police officer cannot assume that any given person doing it is breaking the law. Absent some other circumstances giving rise to a suspicion of criminality, a seizure upon that basis alone is unreasonable.

In the United States of America, it is not a trivial matter to be detained under the color of state authority. Although the "stop and frisk" is a commonplace and essential law enforcement practice, it nonetheless is a significant intrusion upon citizen liberty, and it carries with it as well a risk of danger to both the police officer and the suspect. As this Court previously has noted: "Unnecessary police intervention, by definition, produces the possibility of conflict where none need exist." *Hawkins*, 692 A.2d at 1071 (plurality).

A police officer is trained to assess people and situations for danger. An officer responding to a dispatch such as the one in this case is capable of responding in a manner not amounting to a seizure by observing the suspect and the circumstances, by determining whether anyone appears to be in danger or whether a crime appears to be occurring, and by interviewing witnesses about any crimes that may have occurred before the officer's arrival. *See Jackson*, 698 A.2d at 575 (reasoning that, where the available information does not give rise to reasonable suspicion, "the police must investigate further by means not constituting a search and seizure."). Such activities preserve peace, law, and order, and do so without depriving anyone of his freedom unless there is cause to do so.

This is not a "special needs" situation, or a seizure "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers" so as to "assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51. This is the targeting of an individual, forcibly seizing and disarming him at gunpoint, removing him from a car and handcuffing him, solely to ascertain whether he *might* be committing a crime.

Undoubtedly aware of the vast number of citizens licensed to carry firearms, police officers surely will not find anything otherwise suspicious about many of the particular individuals who fall within the *Robinson* rule's sweep. But with no other criterion beyond the fact of an individual's possession of a concealed firearm necessary to justify a seizure, the *Robinson* rule allows a police officer to base the decision to detain a particular individual upon an "inchoate and unparticularized suspicion or 'hunch'" that the individual is unlicensed and therefore engaged in wrongdoing. *Terry*, 392 U.S. at 27. This reflects precisely the "kind of standardless and unconstrained discretion," *Prouse*, 440 U.S. at 661, that lends itself to "arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51. The result is an unjustifiable risk of disparate enforcement on the basis of an individual's appearance alone, while the rights of others go unquestioned.

Crime and violence are ever-present threats in society, and it can be tempting to look to the government to provide protection from "dangerous" people with constant vigilance. However, the protections of the Fourth Amendment remain an essential bulwark against the overreaches and abuses of governmental authority over *all* individuals. Notwithstanding the dangers posed by the few, we must remain wary of the diminution of the core liberties that define our republic, even when the curtailment of

individual liberty appears to serve an interest as paramount as public safety. "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting).

In light of all of the foregoing, it has become clear that the Superior Court patently has erred in concluding that the "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Robinson*, 600 A.2d at 959. This holding facially contravenes established law as set forth in *Terry* and its progeny, demands no suspicion of criminal activity—let alone individualized suspicion—and countenances a sweeping and unjustified expansion of the authority of law enforcement to seize persons upon the basis of conduct that, standing alone, an officer cannot reasonably suspect to be criminal. Indeed, the *Robinson* rule does not contemplate a *Terry* stop at all, but rather a wholly distinct species of police intrusion, untethered from the law upon which it ostensibly is premised, and ultimately lacking any justification in the basic principles of the Fourth Amendment.

We accordingly overrule *Robinson* and those decisions of our Superior Court that have reaffirmed and applied its holding.

## III. Disposition of the Instant Case

Notwithstanding the lower courts' application of an erroneous conclusion of law, there remains a question of whether Hicks' seizure nonetheless was supported by

reasonable, articulable suspicion of criminal activity, such as would render the investigative detention lawful.

We reiterate that our standard and scope of review require us to assess whether the suppression court's findings of fact find support in the record, and, because it was Hicks who appealed the suppression court's order, we consider all of the Commonwealth's evidence, but only so much of Hicks' evidence as, when read fairly in context of the whole suppression record, remains uncontradicted. *In re L.J.*, 79 A.3d 1073, 1079-80 (Pa. 2013). "We also note that in the suppression context, appellate courts do not simply comb through the record to find evidence favorable to a particular ruling. Rather, appellate courts look to the specific findings of fact made by the suppression court." *Id.* at 1085.

At oral argument before this Court, the Commonwealth abandoned the argument advanced in its principal brief, contending instead that Hicks' judgment of sentence should be affirmed because Hicks' seizure was supported by reasonable, articulable suspicion of criminal activity. The facts giving rise to reasonable suspicion, the Commonwealth contended, were the "showing" of a firearm to another individual, near 3:00 a.m., in a high crime area, where the officer previously had responded to calls regarding criminal activity. The Commonwealth further made reference to Officer Pammer's testimony regarding "brandishing" of the firearm, but nonetheless contended that the trial court's finding of fact, referring to "showing" of the firearm, established sufficient grounds for an investigative detention. *See* Order, 9/18/2015, at 1 n.1. As phrased at oral argument, the Commonwealth described the information available to the officers at the time of the seizure as follows: "[Hicks] lifted up his shirt, he pulled out a weapon, showed it, put it back in his waistband, pulled his shirt over top of it, and went into the store." Oral Argument, 12/4/2018, Harrisburg.

We begin with Officer Pammer's testimony regarding Hicks' "brandishing" of the firearm. Although not a defined offense under Pennsylvania law, "brandishing" suggests the use of a weapon in a threatening manner, or perhaps its display in a reckless or ostentatious fashion. For present purposes, we will assume without deciding that, if established, an individual's "brandishing" of a firearm may establish reasonable suspicion that the individual engaged in some type of violent or assaultive conduct that would constitute a criminal offense under the statutes of this Commonwealth. We turn to the evidence presented at Hicks' suppression hearing on July 14, 2015, bearing in mind the suppression court's findings of fact, which stated that Hicks "*showed* the firearm to another patron, put the firearm in his waistband, covered it with his shirt, and walked inside" the convenience store. Order, 9/18/2015, at 1 n.1 (emphasis added).

Officer Pammer was the sole witness at the suppression hearing. Officer Pammer testified about the information that he received before responding to the scene, which began with a "tone" over the police dispatch, which is "an indicator to all city police units . . . that a serious call is unfolding and to wait for the dispatch to give it to you." Notes of Testimony ("N.T."), 7/14/2015, at 6. The tone, Officer Pammer testified, was "for an individual at the Pace Market Gulf station at Seventh and Tilghman Streets that was brandishing a firearm." *Id.* Officer Pammer further clarified that the "dispatchers advised over our police dispatch to all units that a male in a white shirt was brandishing a firearm towards another male at the Pace Mart and that he was driving, I believe it was a silver [Chevrolet] Impala." *Id.* at 7-8.

On cross-examination, defense counsel challenged Officer Pammer's use of the word "brandishing." Officer Pammer testified as follows:

[Defense Counsel]: Do you recall specifically what the dispatch would have said? I know you said brandishing a firearm, do you recall that the dispatch actually said firearm—just showed it to another individual at the gas station?

[Officer Pammer]: I don't remember that, I just remember that it was brandishing—it doesn't—they didn't state that it was pointed or—

[Defense Counsel]: Okay.

[Officer Pammer]: —or you know, threatening somebody with it, just somebody was holding a gun, along that nature.

[Defense Counsel]: And you received that information over a police radio broadcast?

[Officer Pammer]: Yes.

[Defense Counsel]: Okay. And to the best of your knowledge are those recorded?

[Officer Pammer]: They should be. Yes.

[Defense Counsel]: Okay. So, if there are recordings of those police broadcasts, they would be the true and accurate information that you received on that evening. Correct?

[Officer Pammer]: Correct.

*Id.* at 14-15.

There were, indeed, audio recordings of the police dispatch that morning, including a recording of the report that the camera operator provided to the police. The audio recordings were submitted into evidence as Defense Exhibit 2, along with a recording of the video feed that the camera operator was watching, submitted into evidence as Defense Exhibit 1.

This Court has carefully reviewed the audio and video evidence. Defense Exhibit 2 includes recordings of the police dispatch, the camera operator's report, and the subsequent communications between the police officers as they investigated Hicks' possession of his firearm.[18] Most notably, the word "brandishing" is not used at any point

---

[18] The audio recordings also chronicled the officers' examination of the handgun's serial number, which revealed that Hicks was the individual who lawfully purchased the

by either the camera operator or the police dispatcher. The "tone" that Officer Pammer described clearly is audible in the dispatch recording. The tone is followed by a dispatcher's advisement that the "camera operator observed a black male, white shirt, *put a gun in his waistband*. He'll be next to a two-tone black Impala. Pump number six." Police Dispatch, 6/28/2014, Defense Exhibit 2 (emphasis added).

Although Officer Pammer accurately recalled other details contained within the dispatch, such as the description of Hicks' apparel and the model of automobile that he drove, Officer Pammer's testimony substituted the word "brandishing" for the much more innocuous conduct described by the dispatcher, which was merely that Hicks "put a gun in his waistband." That description provided by the dispatch was the basis for Hicks' seizure.

In light of Officer Pammer's express and unequivocal recognition that an audio recording of the dispatch would reflect "the true and accurate information" upon which the officers relied, N.T., 7/14/2015, at 15, it cannot reasonably be contended that the audio recording of the dispatch was "contradicted" by the Commonwealth's evidence, such that we must discount it from our review of the suppression court's findings of fact. Further, on cross-examination, Officer Pammer clarified that the information provided to the officers did not suggest that Hicks had "pointed" the handgun at anyone, or that he was "threatening somebody with it," but, instead, that "just somebody was holding a gun, along that nature." *Id.*

An audio recording of the camera operator's description of Hicks' behavior is included within Defense Exhibit 2. The camera operator provided this report after the police officers had arrived on the scene, and after Hicks already had been seized. Thus,

---

handgun, on February 26, 2013. The officers further checked Hicks' license to carry a concealed firearm, which was valid and not scheduled to expire until March 2018.

its contents have little to no bearing upon the police officers' assessment of reasonable suspicion. *See, e.g.*, *J.L.*, 529 U.S. at 271 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). Nonetheless, because we must view all of the evidence of record in the light most favorable to the Commonwealth, and for the avoidance of any doubt with regard to whether the camera operator's knowledge may be imputed to the officers, *c.f. Commonwealth v. Yong*, 177 A.3d 876 (Pa. 2018), we assess whether the camera operator's description offers any support for the Commonwealth's position. The report proceeded as follows:

> Police Officer: All right. What exactly did you see? Did you, uh, see him take the gun out, or just his shirt lifted up?
>
> Camera Operator: No, when he gets out of the car, he was where your car [inaudible], where that black one is now, at pump six. There was another vehicle there. He gets out of his car next to it, on the opposite side of pump six, that black car there. Gets out of the car, does a handshake with a guy, I see him putting it in his waistband and then pulls his shirt over it. I can see it clear as day that it's a firearm.
>
> Police Officer: Copy.
>
> Camera Operator: The gentleman he was with made sure he knew he had a firearm on him. And then walked into the store with it after he pulled his shirt over it. I didn't think he had a holster, I thought he just put it in the waistband.

Camera Operator Report, 6/28/2018, Defense Exhibit 2. Like the dispatcher, the camera operator does not use the word "brandishing" or otherwise describe any kind of violent or threatening conduct.

This Court also has carefully reviewed the video footage recorded by the camera operator that morning, submitted into evidence as Defense Exhibit 1, the contents of which the Commonwealth's evidence did not contradict. Because both Hicks and the

Commonwealth repeatedly refer to the video's contents, we will describe what we see therein.

Hicks arrives at the Pace Mart at 2:31 a.m. and parks his vehicle at a gas pump. A second, unidentified individual already was parked at an adjacent gas pump. The individual clearly recognizes Hicks as an acquaintance, and approaches Hicks' vehicle to greet him. Hicks exits his vehicle, and his firearm becomes visible, albeit barely. Hicks either is holstering the firearm or adjusting his garments around it when the second individual reaches Hicks' driver's side door, which is still open. The individual greets Hicks, and the two men shake hands with a brief, one-armed embrace. Hicks does not appear to gesture or point to the firearm, and he does not remove it from his waistband at any point. Hicks begins to walk toward the convenience store, continuing to adjust the position of the handgun, which becomes more clearly visible for a moment. Thereafter, the handgun is holstered outside Hicks' waistband and covered by his shirt, but its outline remains visible. Hicks enters the store, exits a short time later, then returns to the gas pump, where he begins to fuel his vehicle. Hicks speaks briefly to a third, unidentified individual while he pumps gas. Hicks then reenters his vehicle and begins to pull away from the gas pump. Moments later, numerous marked police vehicles intercept Hicks' vehicle with their lights flashing.

Even viewing all of the evidence in the light most favorable to the Commonwealth, there exists no basis for a finding that Hicks was engaged in any manner of criminal conduct. There was no indication or apparent threat of violence, and no information suggesting that Hicks engaged in any type of confrontation with another individual, physical, verbal, or otherwise. Neither the camera operator's report nor the police radio dispatch suggest anything of the sort. Indeed, "[t]he video from the camera clearly shows the firearm concealed in [Hicks'] waistband and that, despite the hour, there are a number

of individuals at this location." Brief for Commonwealth at 16. However, significantly, no individual expresses any visible indication of alarm at Hicks' presence, his possession of his firearm, or the manner in which he carried it. Rather, the video depicts patrons of a gas station going about their business, at least two of whom engage in seemingly friendly interactions with Hicks.

In light of defense counsel's use of the word "showed" when cross-examining Officer Pammer, N.T., 7/14/2015, at 15, we conclude that the record contains minimal support for the suppression court's finding that Hicks "showed" his firearm to another individual. Order, 9/18/2015, at 1 n.1. We find no evidentiary support for an alternative contention that Hicks "brandished" the firearm in any way, or at anyone. Further, the characterization that the Commonwealth provided at oral argument—that Hicks *removed* the handgun from his waistband, showed it to another individual, then placed it back in his waistband—is likewise unsupported by the evidence of record.

All that remains is the Commonwealth's repeated emphasis upon the time of day at which the seizure occurred and the fact that Hicks was seized in what Officer Pammer described, based upon his experience, as a high crime neighborhood. These can serve as relevant contextual considerations in a totality of the circumstances inquiry. *See, e.g.*, *Adams*, 407 U.S. at 147-48; *but see Wardlow*, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Even taking into account the early morning hour and Officer Pammer's characterization of the neighborhood, there remains no particularized basis upon which to suspect that Hicks' mere possession of a concealed firearm was unlawful.

In consideration of the totality of the circumstances, even in the light most favorable to the Commonwealth, the facts do not support a finding of reasonable, articulable

suspicion that Hicks was engaged in any manner of criminal activity on the morning that he was seized. As the suppression court found, and as confirmed by the evidence of record, Hicks was seized solely due to the observation of a firearm concealed on his person. Although such a seizure then may have been viewed as constitutional under prevailing Superior Court precedent, we reject that precedent today.

Michael Hicks was deprived of the protections of the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution, and the evidence derivative of his seizure should have been suppressed.

The judgment of sentence is vacated, and the matter is remanded for further proceedings consistent with this Opinion.

Chief Justice Saylor and Justices Todd and Donohue join the opinion.

Justice Baer joins Parts I, II.A, B., and C.(i.-v.) and files a concurring opinion.

Justice Dougherty files a concurring opinion in which Justice Mundy joins.