J-A13001-24

2024 PA Super 183

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| TARIQUE AARON LEE HOLLEY | : | No. 766 WDA 2023 |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0008953-2022

BEFORE: OLSON, J., SULLIVAN, J., and BENDER, P.J.E.

OPINION BY OLSON, J.:                    **FILED: August 16, 2024**

The Commonwealth of Pennsylvania (Commonwealth) appeals from an order entered on June 27, 2023 in the Criminal Division of the Court of Common Pleas of Allegheny County. The order challenged on appeal granted a motion to suppress filed on behalf of Appellee, Tarique Aaron Holley (Holley).[1] We vacate the order of June 27, 2023 and remand for further proceedings.

The trial court aptly summarized the uncontradicted testimony of Officer James Verbitsky, the sole witness who testified about the underlying facts at Holley's suppression hearing.

---

[1] The Commonwealth may appeal as of right from "an order that does not end the entire case where the Commonwealth certifies in [its] notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d). Here, the Commonwealth included the required certification with its timely notice of appeal.

On or about October 6, 2022, Officer James Verbitsky of the City of Pittsburgh [Police Department was on patrol] in the downtown area of the city due to an [uptick] in [violent crime] in the area. Officer Verbitsky testified that at the time of the incident, four schools in the area let out around the same time and a large number of juveniles congregate[d] in that area. Officer Verbitsky was approached by a juvenile who informed him [] there was an individual (later determined to be [Holley]) wearing [an animated television] character hoodie [and] holding a handgun[, which he had] tucked [] into his [pocket]. Officer Verbitsky located [Holley] and observed him holding a handgun in his right hand. Upon seeing the officers, [Holley] then [immediately returned the gun to his pocket]. Officer Verbitsky then drew his firearm and pointed it at [Holley] while other officers ordered [Holley] to the ground in a prone position and handcuffed him. It was later determined that [Holley] did not have a valid conceal[ed] carry permit and he subsequently was transported to the Allegheny County Jail.

Trial Court Opinion, 7/25/23, at 2-3.

As a result of his October 6, 2022 police encounter, Holley was charged with one count each of carrying a firearm without a license, in violation of 18 Pa.C.S. § 6106(a)(1), and carrying a loaded weapon, in violation of 18 Pa.C.S. § 6106.1. On April 4, 2023, Holley, through the Allegheny County Office of the Public Defender, moved to suppress the firearm, claiming that the police lacked reasonable suspicion that criminal activity was afoot to support an investigative detention. A hearing was convened on May 9, 2023 and, after Officer Verbitsky concluded his testimony, the trial court took the matter under advisement. On June 27, 2023, the court issued an order granting Holley's motion to suppress.

On June 29, 2023, the Commonwealth filed a timely notice of appeal. Thereafter, pursuant to court order, the Commonwealth filed its statement of

errors complained of on appeal on July 18, 2023. The trial court issued its opinion on July 26, 2023.

On appeal, the Commonwealth raises the following issue for our consideration.

> Did the trial court err in granting [Holley's] motion to suppress his firearm on the basis that the officer lacked the requisite reasonable suspicion that [Holley] was engaged in criminal activity such that the seizure of his person was warranted, where, amidst a large group of juveniles in an area of town where violence involving juveniles had regularly occurred, [Holley] was observed with a gun in his hand and then, after returning it to his pocket, he took the gun out yet again, only to return it to his pocket a second time after he noticed that the officer was watching him?

Commonwealth Brief at 4.

In the sole issue it raises on appeal, the Commonwealth argues that Officer Verbitsky articulated several specific facts that led him reasonably to suspect that criminal activity was afoot when his armed encounter with Holley occurred on October 6, 2022. In particular, the Commonwealth noted that "[Holley] had [a] gun in his hand, not concealed on his person; that [Holley] took [the gun] out of his pocket a second time after having put it away; that [Holley] gripped the gun in a manner that suggested to the officer that [Holley] was going to fire it; that [Holley] only put the gun back in his pocket again because he saw the officer was watching him; and, crucially, [Holley's] actions took place in an area of downtown Pittsburgh populated by 75 to 100 juveniles where [fights and shootings] involving juveniles had been known to occur." *Id.* at 9; *see also* N.T. Suppression, 5/9/23, at 6-9. In view of these

- 3 -

factors, the Commonwealth concludes that this case more strongly demonstrates reasonable suspicion of criminal activity than the circumstances before our Supreme Court in **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019). Hence, the Commonwealth asserts that the trial court erred in granting Holley's motion to suppress.

Our review of an order granting a defense motion to suppress is guided by the following standard.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

**Commonwealth v. Korn**, 139 A.3d 249, 252-53 (Pa. Super. 2016) (citations omitted and formatting altered).

Neither side in this appeal contests the conclusion that Holley was subject to immediate detention for investigative purposes after Officer Verbitsky observed, among other things, a firearm in Holley's possession. Hence, we focus our analysis on the sole issue litigated on appeal: whether

- 4 -

the record established at Holley's suppression hearing justified an investigative detention.

An investigative detention is one of three levels of police-citizen encounters recognized under Pennsylvania law. *See Commonwealth v. Muhammad*, 289 A.3d 1078, 1086-1087 (Pa. Super. 2023) (acknowledging, in addition to the investigative detention, the mere encounter and custodial arrest). To guard individual liberty and vindicate the right of citizens to be secure in their persons, houses, papers, and possessions, an investigative detention must be supported by reasonable suspicion. *See id*.

To assess whether an officer possesses reasonable suspicion, courts "accord due weight to the specific reasonable inferences [the officer may] draw from the facts in light of his experience." *Commonwealth v. Sands*, 887 A.2d 261, 272 (Pa. Super. 2005). Reasonable suspicion requires an evaluation of the totality of the circumstances. *Commonwealth v. Holmes*, 14 A.3d 89, 95-96 (Pa. 2011). Our Supreme Court has explained the Commonwealth's burden in proving reasonable suspicion.

> Reasonable suspicion is a less stringent standard than [the] probable cause necessary to effectuate a warrantless arrest and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to specific and articulable facts leading him to suspect criminal activity is afoot. In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[,] and acknowledge that innocent facts, when considered collectively, may permit the investigative detention.

*Commonwealth v. Brown*, 996 A.2d 473, 477 (Pa. 2010) (citations and quotation marks omitted).

*Hicks* addressed whether a police officer may reasonably infer criminal activity from a citizen's mere possession of a concealed firearm in public. The opinion overruled *Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. 1991), a prior decision in which this Court held the "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Id.* at 959 (also known as the "*Robinson* rule"). In relevant part, the Supreme Court in *Hicks* saw

> **no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public**. [It] is not a criminal offense for a license holder [ ] to carry a concealed firearm in public. Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, *see* 18 Pa.C.S.A. §§ 6105-6106, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance. As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal. Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Hicks*, 208 A.3d at 936–937 (emphasis added). Ultimately, *Hicks* rejected the *Robinson* rule because it failed to embrace "a first principle that lies at the heart of the Fourth Amendment — that the government may not target and seize specific individuals without any **particular suspicion** of wrongdoing, then force them to prove that they are not committing crimes." *Hicks*, 208 A.3d at 942 (emphasis added) and 947 (noting that the *Robinson* rule essentially required no suspicion, let alone individualized suspicion).

Here, the trial court concluded that Officer Verbitsky's testimony at the suppression hearing did not establish that Holley exhibited "behavior indicative of illegal possession of a firearm or illegal use of a firearm." Trial Court Opinion, 7/26/23, at 3. According to the trial court, the record was "devoid of any testimony [demonstrating] what specifically made [the] officers believe a crime was occurring, about to occur and/or had just occurred." *Id.* Thus, relying on *Hicks*, the court granted Holley's motion to suppress. The Commonwealth disputes this assessment, pointing out that *Hicks* is factually distinguishable since Officer Verbitsky cited several factors, beyond Holley's mere possession of a firearm, which led him to conclude, under the circumstances, that criminal activity was afoot. *See* Commonwealth's Brief at 12.

Because the Commonwealth stresses that the facts of the present case both distinguish it from *Hicks* and compel a different legal conclusion, we begin our analysis by recounting our Supreme Court's detailed summary of

the salient, and uncontradicted, events in **Hicks**, together with the inferences

to be drawn from those facts.[2]

> Hicks arrive[d] at the Pace Mart at 2:31 a.m. and park[ed] his vehicle at a gas pump. A second, unidentified individual already was parked at an adjacent gas pump. The individual clearly recognize[d] Hicks as an acquaintance, and approache[d] Hicks' vehicle to greet him. Hicks exit[ed] his vehicle, and his firearm [became] visible, albeit barely. Hicks either [holstered the firearm or adjusted] his garments around it when the second individual reache[d] Hicks' driver's side door, which [was] still open. The individual greet[ed] Hicks, and the two men [shook] hands with a brief, one-armed embrace. Hicks [did] not appear to gesture or point to the firearm, and he [did] not remove it from his waistband at any point. Hicks [began] to walk toward the convenience store, continuing to adjust the position of the handgun, which [became] more clearly visible for a moment. Thereafter, the handgun [was] holstered outside Hicks' waistband and covered by his shirt, but its outline remain[ed] visible. Hicks enter[ed] the store, exit[ed] a short time later, then return[ed] to the gas pump, where he [began] to fuel his vehicle. Hicks [spoke] briefly to a third, unidentified individual while he pump[ed] gas. Hicks then reenter[ed] his vehicle and [began] to pull away from the gas pump. Moments later, numerous marked police vehicles intercept[ed] Hicks' vehicle with their lights flashing.
>
> Even viewing all of the evidence in the light most favorable to the Commonwealth, there exist[ed] no basis for a finding that Hicks [engaged] in any manner of criminal conduct. There was no indication or apparent threat of violence, and no information suggesting that Hicks engaged in any type of confrontation with another individual, physical, verbal, or otherwise. Neither the camera operator's report nor the police radio dispatch suggest anything of the sort. Indeed, "[t]he video from the camera clearly

---

[2] The factual recitation offered in **Hicks** reflected the Supreme Court's observations of video footage recorded by the camera operator who initiated the 911 call that alerted police to Hicks' possession of a firearm at a convenience store and gas station. **See Hicks** 208 A.3d at 950. The Court noted that the videotape was admitted into evidence at trial, did not contradict the Commonwealth's proof, and was repeatedly referred to by the parties. **See id.**

show[ed] the firearm concealed in [Hicks'] waistband and that, despite the hour, there are a number of individuals at this location." Brief for Commonwealth at 16. However, significantly, no individual expresse[d] any visible indication of alarm at Hicks' presence, his possession of his firearm, or the manner in which he carried it. Rather, the video depict[ed] patrons of a gas station going about their business, at least two of whom engage[d] in seemingly friendly interactions with Hicks.

In light of defense counsel's use of the word "showed" when cross-examining Officer Pammer, N.T., 7/14/2015, at 15, we conclude that the record contains minimal support for the suppression court's finding that Hicks "showed" his firearm to another individual. Order, 9/18/2015, at 1 n.1. We find no evidentiary support for an alternative contention that Hicks "brandished" the firearm in any way, or at anyone. Further, the characterization that the Commonwealth provided at oral argument — that Hicks removed the handgun from his waistband, showed it to another individual, then placed it back in his waistband — is likewise unsupported by the evidence of record.

All that remains is the Commonwealth's repeated emphasis upon the time of day at which the seizure occurred and the fact that Hicks was seized in what Officer Pammer described, based upon his experience, as a high crime neighborhood. These can serve as relevant contextual considerations in a totality of the circumstances inquiry. *See*, *e.g.*, [***Adams v. Williams***, 407 U.S. 142, 147-148 (1972); ***but see Illinois v. Wardlow***, 528 U.S. 119, 124 (2000)] ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Even taking into account the early morning hour and Officer Pammer's characterization of the neighborhood, there remains no particularized basis upon which to suspect that Hicks' mere possession of a concealed firearm was unlawful.

In consideration of the totality of the circumstances, even in the light most favorable to the Commonwealth, the facts do not support a finding of reasonable, articulable suspicion that Hicks was engaged in any manner of criminal activity on the morning that he was seized. As the suppression court found, and as confirmed by the evidence of record, Hicks was seized solely due to the observation of a firearm concealed on his person. Although such a seizure then may have been viewed as constitutional under

prevailing Superior Court precedent, we reject that precedent today.

*Hicks*, 208 A.3d at 950-951.

In *Hicks*, the Court explained that its decision proscribed only those seizures based exclusively upon the **mere** possession of a concealed firearm, which – standing alone – is insufficient to support an inference that criminal activity is afoot. *See id.* at 945. In fact, the Court made clear that the Fourth Amendment tolerates a seizure so long as law enforcement personnel articulate facts which show that the conduct underlying the detention arises from actual **suspicion** of criminal activity in a meaningful sense of that term. *See id.* Thus, *Hicks* permits seizures that are aimed at forestalling impending criminal activity so long as the police cite specific factors to substantiate a reasonable inference that a firearm will be used in a criminal manner. *See id.* at 937.

With these principles in mind, we agree with the Commonwealth that the circumstances in this case are distinct from those before the Court in *Hicks* and that Officer Verbitsky established reasonable suspicion to support Holley's detention on October 6, 2022. As the Commonwealth points out, the Supreme Court determined that the record in *Hicks* did not support the finding that Hicks removed his firearm from his waistband. Here, however, the record showed that Holley twice removed his firearm from the pocket of his hooded sweatshirt. *See* N.T., 5/9/23, at 7-9. Moreover, in contrast to *Hicks*, where the videotape depicted "no indication or apparent threat of violence," Officer

- 10 -

Verbitsky testified that Holley took "a shooter['s] grip" of his handgun in a crowd of juveniles and rapidly returned it to his pocket when he observed the officer. *See id*. at 8. Officer Verbitsky characterized Holley's grasp of the firearm as one that would readily permit him to discharge the weapon if he chose to do so. *See id*. Lastly, while no one expressed alarm at Hicks' presence, his possession of a firearm, or the manner in which Hicks carried his firearm, at least one young man in the instant case was sufficiently alarmed at Holley's possession of a firearm that he alerted Officer Verbitsky of the situation. *See id*. at 6. Officer Verbitsky further testified that these events transpired in the presence of 75 to 100 youths and during his patrol of a downtown Pittsburgh location known for after-school juvenile fights and shootings. *See id*. Taking all of these circumstances into account, including the time and place of the incident, Officer Verbitsky's specific observations and experience, and the reasonable inferences that permissibly could be drawn from the articulated (and uncontradicted) facts, we conclude that the Commonwealth met its burden in establishing that Officer Verbitsky possessed particularized and reasonable grounds to suspect that Holley intended to deploy his firearm in a criminal manner and, therefore, that criminal activity was afoot. Accordingly, we vacate the June 27, 2023 order that granted Holley's motion to suppress and remand for further proceedings.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/16/2024