J-A17039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ISIAH GIBBONS | : | No. 1940 EDA 2023 |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007571-2022

BEFORE: BOWES, J., NICHOLS, J., and SULLIVAN, J.

DISSENTING MEMORANDUM BY BOWES, J.:     **FILED NOVEMBER 17, 2025**

Respectfully, I cannot agree with my esteemed colleagues that the trial court properly granted the motion to suppress filed by Isiah Gibbons. Since I would instead reverse the order, I lodge this dissent.

Here, Mr. Gibbons presented no contradictory evidence at the suppression hearing. Indeed, there is no disagreement over the facts of the interaction between him and the police officers. Rather, it is the trial court's application of the facts to the pertinent law that the Commonwealth contests. Therefore, I begin by setting forth the relevant legal principles:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are

not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

*Commonwealth v. Korn*, 139 A.3d 249, 252–53 (Pa.Super. 2016) (cleaned up).

It is axiomatic that our analysis of suppression issues depends upon which of the three levels of police interaction is at play:

The first, a mere encounter, does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an investigative detention, permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (cleaned up).

In the matter *sub judice*, I believe our disposition hinges upon when an investigative detention ensued:

In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. We are bound by the suppression court's factual findings, if supported by the record; however, the question presented—whether a seizure occurred—is a pure question of law subject to plenary review.

*Id*. (cleaned up). Our Supreme Court has expanded:

The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [Pennsylvania's High] Court have employed an objective test entailing a determination of whether a reasonable person would

have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

Th[e Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification.

*Id*. at 302–03 (cleaned up).

However, "an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal." *Id*. at 304. In sum, "the 'free-to-leave' standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) (cleaned up).

Once presented with an investigative detention, we must determine whether the officers had the requisite level of suspicion to support the intrusion:

Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with

reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Rice*, 304 A.3d 1255, 1261 (Pa. 2023) (cleaned up).

Further,

[i]n making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

Behavior indicative of the presence of a firearm contributes to the totality of the circumstances in determining whether there is reasonable suspicion to investigate further. *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019).

*Id*. (some citations and ellipses omitted, citation altered).

With this framework in mind, I now restate the timeline of events, as it is paramount to the question before us. Officers Marc Kusowski and Christopher Rycek testified that at approximately 4:55 p.m., on September 29, 2022, they were conducting a "pinpoint grid" to address gun violence in a particular part of Philadelphia when they observed Mr. Gibbons. *See* N.T. Suppression, 5/24/23, at 6. As he crossed the street in front of the marked police vehicle, he pulled his shirt down over his waist. When he continued to walk on the sidewalk, though, his shirt rode up and the officers saw through

his underwear the outline of a firearm plainly visible at his hip. He also had a bag over his shoulder and a bag in his right hand.

Upon observing the firearm, the officers stopped their vehicle and approached Mr. Gibbons to ask if he had a permit. Mr. Gibbons responded affirmatively and that it was located in a nearby house, and he proceeded to walk towards the officers. They explained they could see his gun, and Officer Kusowski asked if he would provide his identification card. As Mr. Gibbons retrieved his identification card from his wallet, he reiterated that the permit was in the house, to which the officers responded that there was nothing wrong with his having a gun.

After Mr. Gibbons handed his identification card to Officer Kusowski, the officer held up the card and asked, "Can I check this? Is that okay?" Exhibit C-6 (Officer Kusowski's body camera) at 1:17-1:19. Mr. Gibbons said, "Yeah, but my jawn [is] in the house."[1] *Id*. at 1:20-1:22. As Officer Kusowski stepped off the curb to go to the patrol car to run the card, Mr. Gibbons volunteered that if his permit did not show up on the check, his brother around the corner had a permit. Mr. Gibbons then used both hands to lift his shirt and pull the waistband of his underwear away from his body, in the exact location where the gun was concealed. Officer Rycek immediately instructed

---

[1] We have explained that "[t]he Oxford Dictionary defines 'jawn' as dialect chiefly used in eastern Pennsylvania to refer to a thing, place, person, or event that one need not or cannot give a specific name to." *Commonwealth v. Massenburg*, 240 A.3d 951, 2020 WL 5640427, at *7 n.2 (Pa.Super. 2020) (non-precedential decision) (cleaned up).

- 5 -

him not to touch the firearm, to which Mr. Gibbons responded, "it's clean" as he lifted his hands into the air. **See** Exhibit C-7 (Officer Rycek's body camera) at 1:26-29.

Officer Rycek secured the firearm and asked for confirmation that the brother, not Mr. Gibbons, had the permit. Mr. Gibbons agreed that his brother had the permit. Simultaneously, Officer Kusowski sat down in the front passenger seat of the patrol vehicle and hit what looked like the "tab" key on the keyboard a few times, but returned to the sidewalk as soon as Mr. Gibbons confirmed that his brother was the individual with a permit for the firearm, not him. The officers then placed Mr. Gibbons in handcuffs and into the back of the patrol car while they sorted out the firearm permit.[2]

Based upon these facts, the trial court concluded that once Mr. Gibbons "advised the officers that he had a permit[, t]he officer's persistence in then

_____

[2] Since the trial court determined that an investigative detention began **before** Mr. Gibbons provided his identification card, it glossed over this latter portion of the encounter and did not mention that Mr. Gibbons told the officers that his brother had a permit if his did not show up during the identification check, or that he manipulated his clothing to potentially access the firearm. **See**, **e.g.**, N.T. Findings of Fact, 6/27/23, at 4. The court did not make a determination that the officers' testimony was incredible or the body camera videos were inaccurate. It simply disregarded the uncontroverted video evidence of Mr. Gibbons's statements and movements. "We are bound by the suppression court's factual findings, if supported by the record[.]" **Commonwealth v. Lyles**, 97 A.3d 298, 302 (Pa. 2014) (cleaned up). My review reveals that "[t]his is one of those rare cases where a [body] cam[era] video, which was made a part of the certified record, can contradict a trial court's factual finding[,]" or lack thereof. **Commonwealth v. Griffin**, 116 A.3d 1139, 1143 (Pa.Super. 2015). Therefore, I include the statements and movements in my recitation of the facts.

asking for his license elevated this encounter into a situation where the defendant was not free to walk away. This resulted in a detention without reasonable suspicion." N.T. Findings of Fact, 6/27/23, at 5-6. Accordingly, it granted Mr. Gibbons's suppression motion. The Majority affirms this ruling. Respectfully, I disagree.

My first point of dissension concerns the standard of review to be employed. The Majority affirms the suppression order based upon a finding that the trial court did not abuse its discretion. **See** Majority at 10 ("On this record, we are unable to reverse as an abuse of discretion the suppression court's conclusion that the encounter was an investigative detention for which no reasonable suspicion existed. Accordingly, the court did not abuse its discretion by granting suppression."). However, as recognized by my fellow jurists and as I reiterated hereinabove, we review a trial court's legal conclusions *de novo*. **See Korn**, 139 A.3d at 252-53.

Second, the Majority explains that it upholds the trial court's ruling because:

> a reasonable person would not have felt free to leave when two uniformed officers in a marked patrol car pulled diagonally to the curb directly before him, requested and took his identification, and questioned him about whether he possessed a permit for the gun, particularly where the mere fact of a concealed weapon does not in itself establish reasonable suspicion.

Majority at 9 (citations omitted). The foregoing does not clearly indicate whether my esteemed colleagues agree with the trial court's conclusion that the investigative detention began when the officers asked for identification.

In conducting a *de novo* review, I deem it necessary to delineate precisely when the mere encounter evolved into an investigative detention, and then to look at the totality of the circumstances at that point to determine whether the officers had reasonable suspicion of criminal activity.

Here, the officers did not block Mr. Gibbons's walking path, activate their emergency lights, brandish their weapons, or demonstrate an overwhelming show of force or authority. Indeed, they did not even draw their weapons when he began to reach for his. Instead, it was only at the point of handcuffing him that the officers demonstrated any show of force or authority. If anything, they were friendly and deferential to Mr. Gibbons throughout the interaction while attempting to ensure that he had a permit to carry the firearm tucked inside his underwear.

In my view, this largely tracks with what occurred in **Lyles**:

> The request [for identification] was not accompanied by physical restraint, manifestation of authority, or a mandate to comply. The officer simply asked for appellant's identification; he did not demand it or require acquiescence, and appellant gave it to him voluntarily. The officer did not express dissatisfaction with appellant's reply or tell appellant he was not free to leave. There is no evidence appellant was confined or prevented from departing, or that the officer impeded his movement in any way, as the interaction took place on a public street in broad daylight. There was no evidence the officer brandished a weapon or threatened appellant or that the interaction was *per se* coercive or intimidating. There is no record of the officer displaying an aggressive demeanor or using an authoritative tone suggesting there would be negative consequences if appellant failed to identify himself; he did nothing more than request appellant's identification. Had there been no repetitive furtive conduct by appellant, there is no reason to think the encounter would not

have terminated promptly once the officer recorded the minimal information he requested.

**Lyles**, 97 A.3d at 306 (footnote omitted).

Thus, it is plain to me that a mere encounter persisted during the officers' initial approach and request for identification. As such, I would hold that the trial court erred in concluding that the requests for identification triggered an investigative detention that needed to be supported by reasonable suspicion. This does not end my analysis, however, as this Court may still affirm on any basis. **See Commonwealth v. Seeney**, 316 A.3d 645, 651 n.3 (Pa.Super. 2024). The ensuing questions, then, are when the officers required reasonable suspicion to continue their interaction with Mr. Gibbons, and whether they had it at that time.

Although not *per se* indicative of an investigative detention, our Supreme Court has held that "retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment." **Cost**, 224 A.3d at 651 (Pa. 2020). In **Cost**, the Court found that based upon the circumstances in that case, an investigative detention ensued when the officers took Cost's identification card. **Id**. at 652 ("Coupled with other relevant factors in the case, we conclude that the officer's or his partner's retention of appellant's identification card to conduct a warrant check -- as he was asked if there was anything in his backpack that the officer needed to know about -- was sufficient to signify to a reasonable person that he was not free to proceed about his business." (cleaned up)). In the High Court's analysis, it was "significant . . . that there

[wa]s no evidence that the officer ever explained to [Cost] what he intended to do with the identification card. Rather, from all appearances, once [Cost] gave it to the officer, the officer simply proceeded to do with it as he wished." *Id*.

Unlike in *Cost*, the officers here explained their intentions for Mr. Gibbons's identification card, which he supplied voluntarily and agreed to allow the officers to check it in lieu of walking away. More critically, though, the facts reveal that even before an actual check occurred, Mr. Gibbons (1) spontaneously changed his story and stated that the check might reveal he did not, in fact, have a permit; and (2) lifted his shirt and pulled the waistband of his underwear away from his body to potentially access the firearm located beneath. At that point, the officers ordered him to stop touching the firearm, secured it from his person, and then immediately placed him in handcuffs. Since he was no longer free to leave once his movement was thus restricted by the officers, I would identify the order to stop touching the firearm as the triggering event for an investigative detention. *Id*. at 650 (explaining that in assessing the free-to-leave test, we must determine whether "the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" (cleaned up)).

Having pinpointed when the interaction escalated to an investigative detention, I next consider whether the officers had reasonable suspicion to support the intrusion. At the relevant time, the totality of the circumstances

included the following: (1) the officers were conducting a targeted check to address recent gun violence in the area; (2) Mr. Gibbons had a firearm concealed in his underwear; (3) he attempted to cover the obvious outline of it through his underwear by pulling down his shirt as he walked in front of the marked police vehicle; (4) he lied about having a permit for the firearm; and (5) he attempted to grab the firearm while one of the two officers had walked away to his patrol vehicle. To me, this gives rise to reasonable suspicion that criminal activity was afoot, and the officers were within their rights to conduct an investigative detention to confirm whether Mr. Gibbons lawfully possessed the firearm. *See Rice*, 304 A.3d at 1261.

Since I would reverse the order granting suppression and remand for further proceedings, I submit this dissent.