J-A17039-24                    2026 PA Super 55

COMMONWEALTH OF PENNSYLVANIA

Appellant

v.

ISIAH GIBBONS

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
:
: No. 1940 EDA 2023

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007571-2022

BEFORE: BOWES, J., NICHOLS, J., and SULLIVAN, J.

OPINION BY BOWES, J.:*                    **FILED MARCH 23, 2026**

The Commonwealth of Pennsylvania appeals from the order granting the motion to suppress filed by the defendant, Isiah Gibbons. We reverse and remand for further proceedings.

On September 29, 2022, at approximately 4:55 p.m., officers Marc Kusowski and Christopher Rycek of the Philadelphia Police Department were conducting a "pinpoint grid" to address gun violence in a particular part of Philadelphia when they observed Mr. Gibbons. *See* N.T. Suppression, 5/24/23, at 6. As Mr. Gibbons crossed the street in front of the marked police vehicle, he pulled his shirt down over his waist. When he continued to walk on the sidewalk, though, his shirt rode up and the officers saw through his underwear the outline of a firearm plainly visible at his hip. He also had a bag over his shoulder and another one in his right hand.

_____

* This case was reassigned to the author on January 27, 2026.

Upon spotting the firearm, the officers stopped their vehicle and approached Mr. Gibbons to ask if he had a permit. Mr. Gibbons responded affirmatively and that it was located in a nearby house, and he proceeded to walk toward the officers. They explained they could see his gun, and Officer Kusowski asked if he would provide his identification card. As Mr. Gibbons retrieved his identification card from his wallet, he reiterated that the permit was in the house, to which the officers responded that there was nothing wrong with his having a gun.

After Mr. Gibbons handed his identification card to Officer Kusowski, the officer held up the card and asked, "Can I check this? Is that okay?" Exhibit C-6 (Officer Kusowski's body camera) at 1:17-1:19. Mr. Gibbons said, "Yeah, but my jawn [is] in the house."[1] *Id*. at 1:20-1:22. As Officer Kusowski stepped off the curb to go to the patrol car to run the card, Mr. Gibbons volunteered that if his permit did not show up on the check, his brother around the corner had a permit. Mr. Gibbons then used both hands to lift his shirt and pull the waistband of his underwear away from his body, in the exact location where the gun was concealed. Officer Rycek immediately instructed him not to touch the firearm, to which Mr. Gibbons responded, "it's clean" as

---

[1] We have explained that "[t]he Oxford Dictionary defines 'jawn' as dialect chiefly used in eastern Pennsylvania to refer to a thing, place, person, or event that one need not or cannot give a specific name to." ***Commonwealth v. Massenburg***, 240 A.3d 951, 2020 WL 5640427, at *7 n.2 (Pa.Super. 2020) (non-precedential decision) (cleaned up).

he lifted his hands into the air.  ***See*** Exhibit C-7 (Officer Rycek's body camera) at 1:26-29.

Officer Rycek secured the firearm and asked for confirmation that the brother, not Mr. Gibbons, had the permit.  Mr. Gibbons agreed that his brother had the permit.  Simultaneously, Officer Kusowski sat down in the front passenger seat of the patrol vehicle and hit a key on the keyboard a few times, but returned to the sidewalk as soon as Mr. Gibbons confirmed that his brother was the individual with a permit for the firearm, not him.  The officers then handcuffed Mr. Gibbons and placed him in the back of the patrol car while they sorted out the firearm permit.  In doing so, they confirmed that he did not have one.

Based on the foregoing, Mr. Gibbons was charged with various firearms offenses.  He filed a motion to suppress based upon the search being conducted without probable cause.  The court held a hearing, at which the aforementioned sequence of events was developed through the officers' testimony and their bodycam footage.  Mr. Gibbons offered no testimony or evidence.  After taking the matter under advisement, the court granted the suppression motion.

Certifying that the order substantially handicapped its prosecution of Mr. Gibbons, the Commonwealth timely filed this interlocutory appeal.  It complied with the court's order to submit a concise statement pursuant to Pa.R.A.P.

1925(b),[2] and the court authored a responsive opinion. The Commonwealth asks us to answer a single question: "Did the lower court err in granting the motion to suppress where police saw [Mr. Gibbons] on the street with a gun, approached and spoke with him, and confirmed that he did not have a license for the weapon?" Commonwealth's brief at 4.

We begin by setting forth the relevant legal principles governing our review:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

***Commonwealth v. Korn***, 139 A.3d 249, 252–53 (Pa.Super. 2016) (cleaned up).

This Court's analysis of suppression issues depends upon which of the three levels of police interaction is at play:

---

[2] As a reminder, all Rule 1925(b) orders, including those issued to the Commonwealth, must specify "both the place the appellant can serve the Statement in person and the address to which the appellant can mail the Statement." Pa.R.A.P. 1925(b)(3)(iii).

> The first, a mere encounter, does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an investigative detention, permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (cleaned up). Our disposition in the matter *sub judice* hinges upon when an investigative detention ensued: "In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances." *Id*. (cleaned up). Our Supreme Court expanded:

> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [Pennsylvania's High] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.
>
> Th[e Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification.

*Id*. at 302–03 (cleaned up).

However, "an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible

consequences from a refusal." *Id*. at 304. In sum, "the 'free-to-leave' standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) (cleaned up).

Once we determine that an investigative detention has occurred, we next assess whether the officers had the requisite level of suspicion to support the intrusion:

> Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Rice*, 304 A.3d 1255, 1261 (Pa. 2023) (cleaned up). Further,

> [i]n making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

Behavior indicative of the presence of a firearm contributes to the totality of the circumstances in determining whether there is reasonable suspicion to investigate further. ***Commonwealth v. Hicks***, 208 A.3d 916 (Pa. 2019).

***Id***. (some citations and ellipses omitted, citation altered).

Here, the trial court found that once Mr. Gibbons "advised the officers that he had a permit[, t]he officer's persistence in then asking for his license elevated this encounter into a situation where the defendant was not free to walk away. This resulted in a detention without reasonable suspicion." N.T., 6/27/23, at 5-6. Accordingly, it granted Mr. Gibbons's suppression motion. The Commonwealth, on the other hand, argues that without "any show of force or authority or indic[ation] to [Mr. Gibbons] that he was under criminal investigation," the trial court erred in concluding that "the request for [his] identification transformed this mere encounter into an investigative detention." Commonwealth's brief at 11.

In conducting our *de novo* review consistent with the above principles, we must first delineate precisely when the mere encounter evolved into an investigative detention, and then look at the totality of the circumstances at that point to determine whether the officers had reasonable suspicion of criminal activity. The record evidence reveals that the officers did not block Mr. Gibbons's walking path, activate their emergency lights, brandish any weapons, or demonstrate an overwhelming show of force or authority. Indeed, they did not even draw their firearms when he began to reach in the area where his was located. Instead, it was only at the point of telling him

not to touch the firearm that the officers demonstrated any show of force or authority. If anything, they were friendly and deferential to Mr. Gibbons throughout the interaction while attempting to ensure that he had a permit to carry the firearm tucked inside his underwear.

This series of events largely tracks what occurred in *Lyles*:

> The request [for identification] was not accompanied by physical restraint, manifestation of authority, or a mandate to comply. The officer simply asked for appellant's identification; he did not demand it or require acquiescence, and appellant gave it to him voluntarily. The officer did not express dissatisfaction with appellant's reply or tell appellant he was not free to leave. There is no evidence appellant was confined or prevented from departing, or that the officer impeded his movement in any way, as the interaction took place on a public street in broad daylight. There was no evidence the officer brandished a weapon or threatened appellant or that the interaction was *per se* coercive or intimidating. There is no record of the officer displaying an aggressive demeanor or using an authoritative tone suggesting there would be negative consequences if appellant failed to identify himself; he did nothing more than request appellant's identification. Had there been no repetitive furtive conduct by appellant, there is no reason to think the encounter would not have terminated promptly once the officer recorded the minimal information he requested.

*Lyles*, 97 A.3d at 306 (footnote omitted).

Thus, it is plain that a mere encounter persisted during the officers' initial approach of Mr. Gibbons and request for identification. As such, the trial court erred in concluding that the request for identification alone triggered an investigative detention that needed to be supported by reasonable suspicion. This does not end our analysis, however, as this Court may still affirm on any basis if we discern that suppression was legally warranted. *See*

*Commonwealth v. Seeney*, 316 A.3d 645, 651 n.3 (Pa.Super. 2024). The salient questions, then, are when did the mere encounter shift into an investigative detention, and did the officers have reasonable suspicion to warrant such an intrusion at that time.

Although not *per se* indicative of an investigative detention, our Supreme Court has held that "retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment." *Cost*, 224 A.3d at 651. In *Cost*, the Court found that based upon the circumstances in that case, an investigative detention began when the officers took Cost's identification card. *Id*. at 652 ("Coupled with other relevant factors in the case, we conclude that the officer's or his partner's retention of appellant's identification card to conduct a warrant check -- as he was asked if there was anything in his backpack that the officer needed to know about -- was sufficient to signify to a reasonable person that he was not free to proceed about his business." (cleaned up)). In the High Court's analysis, it was "significant . . . that there [wa]s no evidence that the officer ever explained to [Cost] what he intended to do with the identification card. Rather, from all appearances, once [Cost] gave it to the officer, the officer simply proceeded to do with it as he wished." *Id*.

Unlike in *Cost*, the officers here explained their intentions with respect to Mr. Gibbons's identification card. Instead of walking away from the officers, Mr. Gibbons supplied the card voluntarily and agreed to allow the officers to check it. However, the evidence revealed that before an actual check

occurred, Mr. Gibbons (1) spontaneously changed his story and stated that the check might reveal he did not, in fact, have a permit; and (2) lifted his shirt and pulled the waistband of his underwear away from his body to potentially access the firearm located beneath. At that point, the officers ordered him to stop touching the firearm, secured it from his person, and placed him in handcuffs. Since he was no longer free to leave once his movement was restricted by the officers, we conclude that the order to stop touching the firearm was the triggering event for an investigative detention. *Id*. at 650 (explaining that in assessing the free-to-leave test, we must determine whether "the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" (cleaned up)).

Having pinpointed when the interaction escalated to an investigative detention, we next consider whether the officers had reasonable suspicion to support that intrusion. At the relevant time, the totality of the circumstances included the following: (1) the officers were conducting a targeted check to address recent gun violence in the area; (2) Mr. Gibbons had a firearm concealed in his underwear; (3) he attempted to cover the obvious outline of it through his underwear by pulling down his shirt as he walked in front of the marked police vehicle; (4) he lied about having a permit for the firearm; and (5) he made movements to uncover and access the firearm while one of the two officers had walked away to his patrol vehicle. Upon review, we hold that this gave rise to reasonable suspicion that criminal activity was afoot, and the

officers were therefore within their rights to conduct an investigative detention to confirm whether Mr. Gibbons lawfully possessed the firearm. ***See Rice***, 304 A.3d at 1261. Accordingly, the trial court erred in granting the suppression motion.

Therefore, we reverse the order and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Nichols joins this Opinion.

Judge Sullivan notes dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/23/2026